**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **EVER-SEAL, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **DURASEAL, INC.,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT

Plaintiff Ever-Seal, Inc. ("Ever-Seal"), by and through undersigned counsel, for its Verified Complaint against Defendant DuraSeal, Inc. ("DuraSeal"), states and alleges as follows:

### I. INTRODUCTION

1.      Ever-Seal recently learned that DuraSeal is an S-Corporation registered in Delaware (rather than merely the d/b/a of its founder and CEO, Stephen Bradley Halferty, who was Ever-Seal's sales manager).

2.      Ever-Seal also recently learned that DuraSeal, Inc. ("DuraSeal") induced, and is continuing to induce, Ever-Seal's former sales manager, Stephen Bradley Halferty ("Halferty"), to breach his Confidentiality Agreement ("Agreement") with Ever-Seal.

3.      Although Halferty filed for Chapter 13 bankruptcy, DuraSeal is an independent legal entity that has not filed bankruptcy.

4.      It was not until May 5, 2022, while being deposed in an adversary proceeding, that Halferty confirmed under oath that DuraSeal is indeed an S-Corporation rather than merely his d/b/a, and that he filed incorporation papers in Delaware in June or July 2021.

5.      DuraSeal, with full knowledge and awareness of the Agreement, tortiously interfered with the Agreement by employing Halferty to work for DuraSeal, a direct competitor of Ever-Seal, in violation of the Agreement's non-competition clause, and caused Halferty to use Ever-Seal's confidential and inside information to assist DuraSeal in its competition with Ever-Seal, in violation of the Agreement's confidentiality clause.

6.      In fact, DuraSeal began tortiously interfering with Halferty and Ever-Seal's Agreement months prior to Halferty's termination from Ever-Seal and in the most egregious manner— by surreptitiously stealing prospective clients and usurping business opportunities for the benefit of DuraSeal through lies, deceit, self-promotion, and underhanded tactics, and utilizing Ever-Seal's confidential and inside information, as well as workers, in order to do so.

7.      DuraSeal's intentional and malicious interference with the Agreement continues today.

8.      DuraSeal interfered, and is continuing to interfere, with Ever-Seal's prospective business relationships by using improper motives and means to divert Ever-Seal's prospective customers away from Ever-Seal and to DuraSeal, including but not limited to misrepresentations and deceit, misuse of inside or confidential information, breaches of contract, breach of a fiduciary relationship, unfair competition, overreaching, and sharp dealing.

9.      As a result of these breaches and DuraSeal's interference, Ever-Seal has lost business, profits, opportunities, customer relationships, and good will.

10.     Such harm is ongoing, irreparable, and increasing each day as Ever-Seal is currently in the middle of its busiest season, when people are outdoors spending more time on their decks and patios.

11.     Ever-Seal brings the present action to halt the immediate, ongoing, and irreparable harm caused by DuraSeal's misconduct, to attempt to recover the losses caused by it, and to deter DuraSeal from engaging in such conduct in the future.

## II. PARTIES

12.     Ever-Seal is a Tennessee corporation with its principal place of business located at 242 W. Main St., Suite 311, Hendersonville, TN 37075.

13.     Ever-Seal provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States, including service areas in Alabama, Georgia, Indiana, North Carolina, South Carolina, Kentucky, Tennessee, and Virginia.

14.     DuraSeal is a Delaware corporation with its principal place of business in North Carolina.

15.     DuraSeal provides wood and concrete restoration and permanent sealing services to individuals and businesses in North Carolina, South Carolina, and Florida.

16.     Halferty, a non-party to this proceeding, is a citizen and resident of North Carolina who worked for Ever-Seal from May 2020 to November 2021 and DuraSeal from approximately June 2021 to present.

17.     On or about January 14, 2022, Halferty filed for Chapter 13 in the United States Bankruptcy Court for the Eastern District of North Carolina, Raleigh Division, and his bankruptcy case is still pending.

18.     On February 23, 2022, Halferty's counsel represented to the Bankruptcy Court that DuraSeal was merely Halferty's sole proprietorship, and nothing more than a d/b/a.

19.     It was not until Halferty was deposed in the bankruptcy adversary proceeding on May 5, 2022 that Halferty confirmed that DuraSeal is actually an S-Corporation formed under Delaware law.

### III.  JURISDICTION & VENUE

20.     This Court has specific personal jurisdiction over DuraSeal because DuraSeal's activities and contacts in Tennessee give rise to this cause of action.  For example, upon information and belief, DuraSeal purchased its chemicals to unlawfully compete against Ever-Seal from the same supplier Ever-Seal uses in Nashville.  Additionally, DuraSeal encouraged Halferty to breach the confidentiality and non-compete provisions of the Agreement by using information and knowledge gained from his training at Ever-Seal, including a week of appointments in Nashville, where he gained on-the-job experience and knowledge of Ever-Seal's business, customers, and potential customers.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these causes of action occurred in the Middle District of Tennessee, DuraSeal is subject to personal jurisdiction in the Middle District of Tennessee as stated herein, and Ever-Seal resides in the Middle District of Tennessee.

22.     This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount at controversy exceeds $75,000 exclusive of interest and costs.

### IV.  FACTUAL ALLEGATIONS

**Ever-Seal Background**

23.     Ever-Seal is Tennessee corporation formed in 2018 that provides wood and concrete restoration and permanent sealing services.

24.     Ever-Seal utilizes a one-time sealant solution called "Seal-It" that is backed by a 25-year manufacturer's warranty.

25.     Ever-Seal is one of only approximately five companies in the United States authorized to offer and install manufacturer-warranted Seal-It.

26.     Seal-It is a penetrant that requires specialized processes in order to accurately and permanently seal exterior wood or concrete.

27.     Since its inception, Ever-Seal has developed certain confidential and proprietary processes, applications, and materials beyond those dictated by the manufacturer in order to set Ever-Seal apart from its competition.

**Ever-Seal Relationship with Halferty**

28.     On or about May 26, 2020, Ever-Seal hired Halferty as an estimator for its sales territory in and around Raleigh, North Carolina.

29.     In his role as estimator, Halferty was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.

30.     At the end of the sales appointments, Halferty would provide his Ever-Seal business card to prospective clients for future correspondence.

31.     Halferty had no prior experience in the concrete and wood sealing industry when he was hired by Ever-Seal.

32.     Ever-Seal trained Halferty on Ever-Seal's unique products, processes, and methods for applying its permanent sealing solution.

33.     Ever-Seal showed Halferty what chemicals it used for specific jobs and what order to apply them in, and even introduced him to Ever-Seal's vendors and suppliers, which information and relationships Halferty did not have prior to working at Ever-Seal.

34.     Ever-Seal further trained Halferty on how to do Ever-Seal's sales presentation, use Ever-Seal's sample and testing materials, measure to accurately bid projects, complete Ever-Seal paperwork, answer prospective customer questions, and perform other general functions involved in the day-to-day tasks of an Ever-Seal sales representative.

35.     Although Halferty's primary sales territory was based in a 100-mile radius from Raleigh, North Carolina, Halferty worked wherever Ever-Seal scheduled him, including in Virginia, Kentucky, Indiana, Georgia, and South Carolina.

36.     In late 2020, Ever-Seal promoted Halferty to sales manager for Ever-Seal.

37.     In his role as sales manager, Halferty was responsible for assisting sales representatives in each Ever-Seal market area at the direction of Ever-Seal management and per Ever-Seal standards, in addition to overseeing his assigned territory in Raleigh, North Carolina and continuing to run the sales appointments assigned to him by Ever-Seal.

38.     Halferty's duties as sales manager included, among others, reviewing each sale as it came in to ensure accuracy before forwarding it to the operations manager, training each new estimator in the new hire's territory, working with each sales team member quarterly for at least one full day in the team members' territory to provide additional training and support, and responding to customer complaints and resolution plans pertaining to estimates.

39.     In his role as sales manager, Halferty had broad access to Ever-Seal's systems and data, including but not limited to Ever-Seal's G-Suite application by and through which Halferty could see historical and future appointment information for the entire sales and operations teams.

40.     In his role as sales manager, Halferty learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price.

41.     In both roles, Halferty had the authority to act on behalf of Ever-Seal for the benefit of Ever-Seal, but Ever-Seal controlled the methods and manner by which Halferty accomplished his work.

42.     In both roles, Halferty was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new customer relationships and business for Ever-Seal.

43.     At the commencement of his working relationship with Ever-Seal, Halferty executed a Confidentiality Agreement ("Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

44.     The Agreement includes a non-competition clause that prohibits Halferty from competing against Ever-Seal for a period of two years following his termination from Ever-Seal. Ex. A, at ¶ 3.

45.     The Agreement further includes a confidentiality clause that prevents Halferty's unauthorized use, disclosure, and dissemination of Ever-Seal's Confidential Information and Materials, both during his working relationship with Ever-Seal and for a period of two years thereafter. *Id.* at ¶¶ 3-5.

46.     The Agreement defines "Confidential Information" as:

Confidential Information means information disclosed by [Ever-Seal] to [Halferty], or its agents, employees and/or independent contractors, in any manner, that is not generally known in the industry in which [Ever-Seal] is engaged, about its business and which [Ever-Seal] desires to be kept confidential.  As to Ever-Seal, Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative,

NSH 2475116.5

management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

*Id.* at ¶ 1.

47.     The Agreement defines "Confidential Materials" as:

Confidential Materials includes all physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

*Id.* at ¶ 2.

48.     Within the Agreement, Halferty acknowledged that he "is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with [his work for Ever-Seal] and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature." *Id.* at ¶ 3.

49.     The Agreement states that "compliance with the terms of this Agreement is necessary to protect the business and good will of each party" and "a breach of this Agreement will irreparably and continually damage the other and that an award of monetary damages will not be adequate to remedy such harm" such that Ever-Seal "shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of monetary damages, insofar as they can be determined, including without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement." *Id.* at ¶ 8.

50.     During the course of his working relationship with Ever-Seal, Ever-Seal provided Halferty access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads,

inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; Ever-Seal's unique and proprietary truck design and functionality; Ever-Seal's financial information including but not limited to its year-to-date sales information for every sales representative at the company; and Ever-Seal's pricing information.

51.     Around November 22, 2021, Ever-Seal terminated its relationship with Halferty based on Halferty failing to show up to scheduled appointments with customers.

52.     On or about November 25, 2021, Ever-Seal requested in writing that Halferty return all Confidential Materials provided to him by Ever-Seal (i.e. the physical embodiments of Ever-Seal's Confidential Information).

53.     Halferty failed and refused to return Ever-Seal's Confidential Materials, including but not limited to Ever-Seal's custom sales cases, presentation materials, sample materials, testing materials, marketing materials, and confidential forms and spreadsheets.

54.     Ever-Seal learned in late December 2021 and early January 2022 that Halferty was doing business as DuraSeal, which competes directly against Ever-Seal for business.

55.     As it turns out, Halferty had been working for DuraSeal and surreptitiously competing with Ever-Seal since approximately June 2021, prior to his termination from Ever-Seal.

**DuraSeal's Misconduct**

56.     Halferty started DuraSeal in approximately June 2021, while he was still working with Ever-Seal and approximately five months before Ever-Seal terminated him.

57.     Halferty kept DuraSeal's creation and existence a secret from Ever-Seal's founder and CEO, Steve Nelson.

58.     DuraSeal competes directly with Ever-Seal.

59.     DuraSeal, like Ever-Seal, provides permanent sealing services for wood and concrete backed by a 25-year warranty.

60.     DuraSeal, like Ever-Seal, utilizes Seal-It for its sealing solution.

61.     DuraSeal, like Ever-Seal, utilizes specific non-sealant chemicals for it services, which it obtains (or has obtained) from a specific supplier in Nashville.

62.     DuraSeal would not have known about these materials or suppliers but for Halferty's work with Ever-Seal, which was subject to the Agreement.

63.     DuraSeal, like Ever-Seal, markets in at least North Carolina and South Carolina.

64.     DuraSeal, like Ever-Seal, provides services in at least North Carolina and South Carolina.

65.     DuraSeal utilized Halferty's relationship with Ever-Seal and the Confidential Information and Materials that Halferty learned from Ever-Seal to divert business from Ever-Seal to DuraSeal, and DuraSeal began doing so while Halferty was still working for Ever-Seal.

66.     DuraSeal intended for Halferty to engage in behavior that breached his contractual and fiduciary duties to Ever-Seal in order to assist DuraSeal with its unlawful competition.

67.     For one example, in or around June 2021, Ever-Seal provided an estimate on a $75,000 job in Banner Elk, North Carolina; although Ever-Seal fielded the inquiry, set up the meeting, and provided the requisite information and estimate to the prospective client, Halferty utilized his role as sales manager to usurp the opportunity for DuraSeal by way of fraud and deception.

68.     For another example, in or around December 2021, Ever-Seal received a call from a customer inquiring why the work on her home had not yet started when she paid her deposit of $10,000 in October 2021; when Ever-Seal informed the customer that it did not find her project in its system, she inquired "doesn't Brad Halferty work for Ever-Seal?" As it turns out, Halferty utilized his relationship with Ever-Seal, and the information he learned from Ever-Seal, to underhandedly steer the opportunity to DuraSeal.

69.     But for Halferty and DuraSeal's interference, these jobs would have gone to Ever-Seal.

70.     Ever-Seal does not know the full extent of Halferty's conduct and actions taken to assist DuraSeal in its competition with Ever-Seal, but Halferty engaged in at least the following actions, all at the intentional direction of DuraSeal and without Ever-Seal's knowledge or authority, while still working for Ever-Seal:

    a.      Halferty utilized his role with Ever-Seal to poach leads for DuraSeal;

    b.      Halferty utilized his role with Ever-Seal to poach operations and sales staff for DuraSeal;

    c.      Halferty attended Ever-Seal sales appointments with prospective customers and unbeknownst to the customer or Ever-Seal directed the work to DuraSeal; he directed the easier jobs to DuraSeal and the more complex, difficult, or undesirable jobs to Ever-Seal;

    d.      Halferty attended Ever-Seal sales appointments with prospective customers and purposely did not make the sale on behalf of Ever-Seal but, instead, utilized the meeting to sabotage Ever-Seal's chances and/or otherwise learn information to secure the sale for DuraSeal (such as by bidding the project high, refusing to do the proper or full sales presentation, being unfriendly, etc.);

e. Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal would complete the project sooner or for a fraction of the price bid by Ever-Seal;

f. Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal, unlike Ever-Seal, was a local company;

g. Halferty guided customers into contracts with DuraSeal, only after securing the meeting with them through his work at Ever-Seal or otherwise becoming aware of them through his work with Ever-Seal, and those customers would have entered into contracts with Ever-Seal but for his interference and misconduct;

h. Halferty personally attended DuraSeal sales appointments and attempted to sell on behalf of DuraSeal the same services offered by Ever-Seal in the same region;

i. Halferty utilized information from Ever-Seal files and databases to secure the project for DuraSeal where Ever-Seal and DuraSeal submitted competing bids on the same project;

j. Halferty, in his role as sales manager, encouraged or assisted Ever-Seal sales representatives to sabotage Ever-Seal sales presentations for the benefit of DuraSeal, such as by purposely bidding the project high, and would offer monetary incentives to do so;

k. Halferty encouraged or assisted other Ever-Seal sales representatives to cover his Ever-Seal sales appointments so that he could sell the same project on DuraSeal;

l. Halferty failed to attend his assigned Ever-Seal sales appointments for the benefit of DuraSeal.

71. At present, Halferty continues to work for and advise DuraSeal, which competes directly against Ever-Seal by submitting bids on the same projects, marketing in the same

NSH 2475116.5

territories, and offering the same permanent sealing services utilizing the same product, processes, and representations.

72.     Halferty further utilized and continues to utilize Ever-Seal's Confidential Information and Materials to help DuraSeal compete unfairly with Ever-Seal.

73.     Ever-Seal does not know the full extent of Halferty's unauthorized use, dissemination, and/or disclosure of Ever-Seal's Confidential Information and Materials but Halferty engaged in at least the following actions, all at the intentional direction of DuraSeal, both during the term of his working relationship with Ever-Seal and within the two year period thereafter:

a.     Used and/or continues to use Ever-Seal's unique techniques, products, and processes for sealing wood and concrete to do business for DuraSeal;

b.     Used and/or continues to use Ever-Seal's private information on leads, inquiries, and prospective customer relationships to acquire business for DuraSeal;

c.     Used and/or continues to use Ever-seal's private bid information to acquire business for DuraSeal;

d.     Used and/or continues to use Ever-Seal's sales presentation book, or portions thereof, in his presentations to prospective customers on behalf of DuraSeal;

e.     Used and/or continues to use Ever-Seal's photographs from Ever-Seal jobs in his marketing materials on behalf of DuraSeal;

f.     Used or/or continues to use marketing research paid for by Ever-Seal, for Ever-Seal, to obtain new business for DuraSeal;

g.     Used and/or continues to use recruiting drives paid for by Ever-Seal, for Ever-Seal, to staff the DuraSeal brand;

        h.      Used and/or continues to use Ever-Seal's proprietary truck design and functionality in his business with DuraSeal.

74.      DuraSeal intentionally and maliciously caused Halferty to engage in such conduct to injure Ever-Seal and to benefit DuraSeal at the expense of Ever-Seal in its competing business.

75.      DuraSeal utilized and continues to utilize Halferty's relationship with Ever-Seal and the training and knowledge that Halferty received from Ever-Seal, including Ever-Seal's Confidential Information and Materials, to compete unfairly with Ever-Seal, driving customers away from Ever-Seal and to DuraSeal.

**Ever-Seal Has Been Damaged**

76.      Ever-Seal has been damaged as a result of Halferty's breaches and DuraSeal's conduct as described herein, including lost business and profits, a significant reduction in Ever-Seal's ratio of leads to estimates, and failure to satisfy test marketing sales expectations in North Carolina.

77.      Upon information and belief, DuraSeal has sourced over 40 specific jobs directly from Ever-Seal's customers and identifiable potential customers that would have gone to Ever-Seal but for Halferty's breaches and DuraSeal's interference.

78.      Ever-Seal has further lost, and continues to lose, prospective customer relationships, goodwill, and fair competition as a result of Halferty's breaches and DuraSeal's interference.

79.      In addition, Ever-Seal has expended, and continues to expend, attorney's fees and litigation costs that it would not have otherwise expended as a result of DuraSeal's conduct.

# V. CLAIMS

## COUNT I – INDUCEMENT OF BREACH OF CONTRACT

### (in violation of Tennessee Code Annotated § 47-50-109)

80.     Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its Verified Complaint.

81.     On May 26, 2020, Halferty entered into a Confidentiality Agreement (the "Agreement") with Ever-Seal, a true and correct copy of which is attached as **Exhibit A**.

82.     The Agreement is an enforceable contract between Ever-Seal and Halferty.

83.     DuraSeal, by and through its relationship with Halferty, was and is aware of the Agreement.

84.     The Agreement states in part:

> [E]mployees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

Ex. A, at ¶ 3.  Plaintiff hereinafter refers to this provision as the "**Non-Compete Clause**."

85.     DuraSeal intentionally interfered with the Agreement by hiring Halferty to work for DuraSeal, which competes directly with Ever-Seal, both during and within the two-year period following his working relationship with Ever-Seal, in breach of the Non-Compete Clause.

86.     DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Non-Compete Clause.

87. As a proximate result of DuraSeal's tortious interference with the Agreement, Halferty materially breached (and continues to materially breach) the Non-Compete Clause by working for DuraSeal.

88. The Agreement further provides that Halferty "shall use any Confidential Information and Materials received [from Ever-Seal] solely in connection with [his work for Ever-Seal]" and that, during his working relationship with Ever-Seal and for two years after, he "will never, directly or indirectly, use, disseminate, disclose or otherwise divulge any Confidential Information or Confidential Material" and "shall prevent any unauthorized disclosure of Confidential Information or Materials by [his] employees, agents or independent contractors." Ex. A, at ¶¶ 3, 5. Plaintiff refers to these provisions as the "**Confidentiality Clause**."

89. The Confidentiality Clause is an enforceable agreement between Ever-Seal and Halferty.

90. DuraSeal tortiously interfered with the Agreement, by directing Halferty to breach the Confidentiality Clause by encouraging Halferty to use Ever-Seal's Confidential Information and Materials for the benefit of DuraSeal and disclose Ever-Seal's Confidential Information and Materials to DuraSeal to compete against Ever-Seal.

91. DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Confidentiality Clause.

92. As a proximate result of DuraSeal's tortious interference with the Agreement, Halferty materially breached (and continues to materially breach) the Confidentiality Clause by using Ever-Seal's Confidential Information and Materials for the benefit of DuraSeal and disseminating, disclosing, or otherwise divulging Ever-Seal's Confidential Information and

Materials to DuraSeal for the purpose of competing against Ever-Seal, both during the term of his working relationship with Ever-Seal and within the two-year period following his termination from Ever-Seal.

93.     Such Confidential Information and Materials include but are not limited to Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; Ever-Seal's unique and proprietary truck design and functionality; Ever-Seal's financial information, including but not limited to its year-to-date sales information for every sales representative at the company; and Ever-Seal's pricing information.

94.     These Confidential Information and Materials are secret, business-related, and afford Ever-Seal a competitive advantage.

95.     As a result of DuraSeal's misconduct, Ever-Seal has and will continue to suffer harm and damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

96.     Additionally, as a result of DuraSeal's misconduct, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and good will.

97.     DuraSeal's tortious interference with the Agreement has further forced Ever-Seal to engage in litigation to protect its business interests and enforce its rights under the Agreement;

had DuraSeal not induced Halferty to breach the Agreement, then Ever-Seal would not have incurred attorneys' fees and litigation expenses.

98.     Ever-Seal is entitled to a judgment against DuraSeal awarding Ever-Seal compensatory damages in an amount to be determined at trial, including attorney fees and litigation expenses under the independent tort theory, and treble damages under Tenn. Code Ann. § 47-50-109; and granting a temporary restraining order, temporary injunction, and permanent injunction prohibiting DuraSeal from entering into (or continuing) any employment, contractual, or advisory relationship with Halferty and from using, disclosing, or disseminating Ever-Seal's Confidential Information and Materials for a period of two years from the date the ongoing breaches stop.

## COUNT II – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

99.     Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its Verified Complaint.

100.     Ever-Seal, through its expense and efforts over time, has development a prospective business relationship with an identifiable class of third persons, namely those in the market for permanent concrete and wood sealing services.

101.     DuraSeal, by and through its relationship with Halferty, was and is aware of this prospective business relationship.

102.     DuraSeal intended and intends to cause a breach or termination to Ever-Seal's prospective business relationship for its own benefit.

103.     DuraSeal has used and is presently using improper means to interfere with Ever-Seal's prospective business relationship, including but not limited to misrepresentations and deceit, misuse of inside or confidential information, breach of contract, breach of a fiduciary relationship, unfair competition, overreaching, and sharp dealing.

104. Ever-Seal had a prospective contract with these potential customers.

105. DuraSeal maliciously and intentionally induced Ever-Seal's prospective customers not to enter into contracts with Ever-Seal.

106. In doing so, DuraSeal acted without justification; DuraSeal's interference was not done in the legitimate exercise of its rights, but instead with a design to injure Ever-Seal or gain some advantage at Ever-Seal's expense.

107. But for DuraSeal's interference, these prospective customers would have entered into contracts with Ever-Seal.

108. The prospective customers would have entered into contracts with Ever-Seal but for DuraSeal's interference because Ever-Seal submitted competing bids on the same projects, Ever-Seal performed a nearly identical sales presentation on the same projects, Ever-Seal offered the same sealing solutions utilizing the same product and processes as those ultimately selected on the project (which were different than those offered by other competitors), and Ever-Seal was the only competing bidder authorized to offer a 25-year manufacturer-backed warranty such as the one offered by DuraSeal.

109. Without the benefit of discovery, Ever-Seal is unable to know the full extent and identity of every Ever-Seal customer or prospective customer with whom DuraSeal interfered but, upon information and belief, DuraSeal poached at least 40 such customers/potential customers from Ever-Seal, the identity of whom Ever-Seal has and will provide upon request.

110. DuraSeal continues to actively solicit business and interfere with Ever-Seal's prospective customers.

111. As a result of DuraSeal's interference, Ever-Seal has and will continue to suffer damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

112. In addition, as a result of DuraSeal's interference, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and good will.

113. DuraSeal's intentional interference has further forced Ever-Seal to engage in litigation to protect its business interests and enforce its rights under the Agreement; had DuraSeal not intentionally interfered, then Ever-Seal would not have incurred attorneys' fees and litigation expenses.

114. Ever-Seal is therefore entitled to a judgment against DuraSeal awarding compensatory and punitive damages in an amount to be determined at trial, and granting a temporary restraining order, temporary injunction, and permanent injunction prohibiting DuraSeal from interfering with Ever-Seal's business relationships, actual or prospective.

## VI. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for the following relief:

(1) that proper process issue upon Defendant and that it be required to appear and answer to this Verified Complaint within the time provided by law;

(2) for entry of temporary, preliminary, and permanent injunctive relief enjoining DuraSeal from employing, contracting, or engaging in any type of advisory relationship with Halferty for a period of two years; from using, disclosing, or disseminating Ever-Seal's Confidential Information and Materials for a period of two years; and from interfering with Ever-Seal's prospective business relationships;

(3)     for judgment against Defendant in an amount to be proved at trial, but not less than $75,000, plus costs and attorney fees incurred, and such other further damages to which Plaintiff may be entitled; and

(4)     for such further and other relief as may be appropriate in accordance with the nature of this cause.

## **JURY DEMAND**

Plaintiff demands a jury trial on all claims and issues so triable.

Respectfully submitted,

/s/ Stephen J. Zralek
Stephen J. Zralek, BPR #18971
SPENCER FANE BONE MCALLESTER
511 Union Street, Suite 1000
Nashville, TN 37219
Tel: (615) 238-6305
Fax: (615) 687-2763
szralek@spencerfane.com

Breanna R. Spackler (*pro hac vice pending*)
SPENCER FANE LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Tel: (816) 292-8487
Fax: (816) 474-3216
bspackler@spencerfane.com

*Attorneys for Plaintiff*

NSH 2475116.5

## VERIFICATION

I declare under penalty of perjury that the foregoing allegations in the Verified Complaint are true and correct, except those made upon information and belief and, as to those, I reasonably believe them to be true.

Executed this _18th_ day of _May_, 2022.

_Steve Nelson_
_____
Steve Nelson, Chief Executive Officer
and Treasurer, Ever-Seal, Inc.

# citrix | RightSignature

## SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
039B969C-0C62-4F6F-B8B4-DB1EEE7689E9

---

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>039B969C-0C62-4F6F-B8B4-DB1EEE7689E9 | **Document Name**<br>Verification Page For Verified Complaint |
| **Transaction Type**<br>Signature Request | **Filename**<br>verification_page_for_verified_complaint.doc |
| **Sent At**<br>05/18/2022 15:12 EDT | **Pages**<br>1 page |
| **Executed At**<br>05/18/2022 15:17 EDT | **Content Type**<br>application/msword |
| **Identity Method**<br>email | **File Size**<br>39 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>a118a3acf40dd33d04cec7b1360d84291c36b4a705243fe7d38bf9c169a65943 |
| **Signed Checksum**<br>a7ad96d431604198c1de2fde795028fed2ade5238b5a94e8f0abef81b8da44ab | |
| **Signer Sequencing**<br>Disabled | |
| **Document Passcode**<br>Enabled | |

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Steven Nelson | **Status**<br>signed | **Viewed At**<br>05/18/2022 15:17 EDT |
| **Email**<br>steve@ever-seal.com | **Multi-factor Digital Fingerprint Checksum**<br>b0d5cde11b104e5d5b259be383b2b87b36109cd4f480c76af3d83d51b7cf15f4 | **Identity Authenticated At**<br>05/18/2022 15:17 EDT |
| **Components**<br>3 | **IP Address**<br>76.18.137.53 | **Signed At**<br>05/18/2022 15:17 EDT |
| | **Device**<br>Chrome via Windows | |
| | **Typed Signature**<br>*Steve Nelson* | |
| | **Signature Reference ID**<br>34A8E349 | |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 05/18/2022 15:12 EDT | Melissa Tomasewski (mtomasewski@spencerfane.com) created document 'verification_page_for_verified_complaint.doc' on Chrome via Windows from 99.26.177.49. |
| 05/18/2022 15:12 EDT | Steven Nelson (steve@ever-seal.com) was emailed a link to sign. |
| 05/18/2022 15:17 EDT | Steven Nelson (steve@ever-seal.com) viewed the document on Chrome via Windows from 76.18.137.53. |
| 05/18/2022 15:17 EDT | Steven Nelson (steve@ever-seal.com) authenticated via email on Chrome via Windows from 76.18.137.53. |
| 05/18/2022 15:17 EDT | Steven Nelson (steve@ever-seal.com) signed the document on Chrome via Windows from 76.18.137.53. |