IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EVER-SEAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:22-cv-00365 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| DURASEAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a Motion for Temporary Restraining Order ("Motion") filed by Plaintiff Ever-Seal, Inc. ("Ever-Seal"). (Doc. No. 8). Counsel for Plaintiff has "certif[ied] that Plaintiff has taken efforts to serve this Motion, Memorandum of Law, and all supporting documents, on [Defendant, DuraSeal, Inc.] by several different means, including via FedEx to DuraSeal's registered agent and a courtesy copy via electronic mail to DuraSeal's founder and CEO (solely in his corporate capacity), Stephen Bradley Halferty." (Doc. No. 8 at 2). Defendant ("DuraSeal") has not replied to the Motion, and the Court certainly cannot say for certain that it has received actual notice. Nevertheless, as set forth below, the Court concludes that resolving the Motion at this time on an *ex parte* basis is warranted and that Plaintiff has met the requirements not only for the issuance of a temporary restraining order (TRO), but for the issuance of such TRO even without notice to DuraSeal.

# BACKGROUND[1]

Ever-Seal is a Tennessee corporation that "provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States" using a "one-time sealant solution called 'Seal-It.'" (Doc. No. 1 at ¶¶ 12-13, 24). Only five companies in the United States are authorized to offer and install Seal-It. (*Id.* at ¶ 25).

Halferty was employed by Ever-Seal from approximately May 2020 to November 2021. (*Id.* at ¶¶ 28, 51). Halferty was initially hired as an estimator for Ever-Seal—a position that involved "attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork." (*Id.* at ¶¶ 28-29). Ever-Seal promoted Halferty to the position of sales manager in 2020, when Halferty became responsible for "assisting sales representatives in each Ever-Seal market area at the direction of Ever-Seal management and per Ever-Seal standards, in addition to overseeing his assigned territory in Raleigh, North Carolina." (*Id.* at ¶¶ 36-37). As sales manager, Halferty "learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price." (*Id.* at ¶ 40).

---

[1] For purposes of ruling on a TRO, the Court typically takes as true facts that fit into the following categories: facts "(1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *1 n. 1 (M.D. Tenn. Nov. 15, 2019). The facts stated herein are taken from Plaintiff's Complaint (Doc. No. 1), which has been verified by Steve Nelson, CEO of Ever-Seal. (Doc. No. 1 at 23). Plaintiff has additionally supported its factual allegations with the Declaration of Tim Lucero, former estimator for Ever-Seal, the Declaration of Steve Nelson, and the deposition testimony of Steven Halferty. (Doc. No. 10-1, 10-2, 10-3, 10-4). The Court thus accepts the facts set forth in this section as true for purposes of ruling on the Motion.

In both roles, Halferty communicated directly with prospective customers on behalf of Ever-Seal and was privy to confidential information including: "EverSeal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality." (*Id.* at ¶¶ 42, 50).

In conjunction with beginning his employment with Ever-Seal, Halferty signed a Confidentiality Agreement that included a non-competition (non-compete) clause prohibiting Halferty from competing against Ever-Seal for two years following his termination from the company. (*Id.* at ¶¶ 43-44; *see also* Confidentiality Agreement (Doc. No. 1-1)). This clause states:

> [E]mployees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

(Doc. No. 1-1 at 1). The Confidentiality Agreement additionally restricts Halferty from disclosing and/or disseminating certain Confidential Information and Materials[2] for a two-year period following termination from the company. (*Id.*). Specifically, the Confidentiality Agreement states:

---

[2] The Confidentiality Agreement defines Confidential Information as:

Each party acknowledges it is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with the Transaction and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature. Each party further acknowledges that, except as otherwise provided herein, during the term of the Transaction and for a period of two years thereafter, it will never, directly or indirectly, use, disseminate, disclose or other wise [sic] divulge any Confidential Information or Confidential Material. Further, each party shall prevent any unauthorized disclosure of Confidential Information or Materials by its employees, agents or independent contractors.

[. . .]

Recipient shall use any Confidential Information and Materials received solely in connection with the Transaction. Recipient shall treat and handle all Confidential Information with the same standard of care used with respect to its own confidential information. Recipient agrees to disclose such Confidential Information only to (i) its officers, directors, employees and affiliates involved in the Transaction; (ii) to such agents, representatives, attorneys and advisors as have been retained by Recipient in connection with the Transaction; (iii) in response to subpoena, court order or similar legal process, or as otherwise required by applicable law or regulation. Recipient shall not remove any proprietary rights legends from Confidential Materials and shall add proprietary rights legends to any materials that disclose or embody Confidential Information. Other than as expressly granted in writing, Discloser does not grant any license to Recipient under any copyrights, patents, trademarks, trade secrets or other proprietary rights to use or reproduce any Confidential Materials. Neither party shall remove from the offices of the other, without written consent, books, records or documents, nor make copies of such books, records, documents or client lists for a use other than in connection with the Transaction.

(*Id*. at 1–2).

---

[I]nformation disclosed by Discloser to Recipient, or its agents, employees and /or independent contractors, in any manner, that is not generally known in the industry in which Discloser is engaged, about its business and which Discloser desires be kept confidential. As to Ever-Seal Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative, management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

(*Id*.). The Confidentiality Agreement defines Confidential Materials as:

[A]ll physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

(*Id.*).

The Confidentiality Agreement also states:

> The parties agree that compliance with the terms of this Agreement is necessary to protect the business and good will of each party. Further, the parties agree that a breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm. Therefore, the parties agree that each shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of money damages, insofar as they can be determined, including, without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement.

(*Id*. at 2).

Ever-Seal terminated Halferty's employment in November 2021. (Doc. No. 1 at ¶ 51). Ever-Seal learned in approximately December 2021 or January 2022 that prior to his termination (specifically, in June 2021), Halferty formed a company called DuraSeal that (just like Ever-Seal) provides permanent sealing services for wood and concrete in (at least) North Carolina and South Carolina and uses the product Seal-It. (*Id*. at ¶¶ 59-64, 71). Halferty kept DuraSeal's creation and existence a secret from Ever-Seal's founder and CEO, Steve Nelson. (*Id*. at ¶ 57).

Halferty formed DuraSeal in June 2021 to compete with Ever-Seal by submitting bids on the same projects, marketing in the same areas, and offering the same permanent sealing services utilizing the same product, processes, and representations. (*Id*. at ¶ 71). "DuraSeal's conduct has damaged and is continuing to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs." (Doc. No. 9 at 8; Doc. No. 1 at ¶¶ 76-79). DuraSeal "has sourced at least 12 separate jobs directly from Ever-Seal, and he is continuing to advertise and sell DuraSeal's competing services in at least North Carolina, South Carolina, Georgia, and Florida." (Doc. No. 9 at 8; Doc.

No. 1 at ¶¶ 95, 111). In the Complaint, Plaintiff asserts two counts: inducement of breach of contract and intentional interference with business relations. (Doc. No. 1 at 12–17).[3]

Plaintiff filed the present Motion seeking entry of temporary restraining order and, following a hearing, a preliminary injunction prohibiting DuraSeal from "(1) inducing anyone who entered into a Confidentiality Agreement with Ever-Seal to breach that agreement, and (2) engaging in conduct that constitutes intentional interference with EverSeal's business relations." (Doc. No. 11 at 1).

## LEGAL STANDARD: TEMPORARY RESTRAINING ORDER

In determining whether to issue a TRO pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others;[4] and (4) the impact of the injunction on the public interest. *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006).

---

[3] In February 2022, Plaintiff filed suit against Steven Halferty d/b/a/ DuraSeal and sought a TRO. (*See* Case No. 3:22-cr-00082). The undersigned found that Plaintiff was likely to succeed on the merits of all three of the claims it asserted against Halferty (those being breach of contract, breach of fiduciary duty, and intentional interference with a business relationship) and issued a TRO on February 11, 2022. (Case No. 3:22-cr-00082, Doc. No. 18). Thereafter, on February 14, 2022, Plaintiff filed a Suggestion of Bankruptcy indicating that Halferty had filed a bankruptcy petition in the Eastern District of North Carolina. (Doc. No. 21). Thus, the undersigned entered an Order noting that the case was automatically stayed pursuant to 11 U.S.C. § 362(a). (Case No. 3:22-cr-00082, Doc. No. 22). That stay remains in effect today.

[4] The reference here to "others" appears to be a reference to third parties, *i.e.,* those not parties to the lawsuit in which the TRO is sought. *See, e.g.*, *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (discussing this factor in terms of "harm to third parties"); *Rhinehart v. Scutt*, 509 F. App'x 510, 512 (6th Cir. 2013) (affirming issuance of preliminary injunction by the district court, which "understood this factor to refer to harm to third parties"); *Hitachi Auto. Sys. Americas, Inc. v. TI Auto. Ligonier Corp.*, No. 5:19-CV-184-JMH, 2019 WL 1995316, at *5 (E.D. Ky. May 6, 2019) (describing this factor, in a single sentence, in terms of "harm to other parties that are not parties to this lawsuit" and in terms of "harm to third-parties").

As the Sixth Circuit has described this test (in the context of a motion for a preliminary injunction):

> Courts sometimes describe this inquiry as a balancing test. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). And that's true, to an extent; district courts weigh the strength of the four factors against one another. But even the strongest showing on the other three factors cannot "eliminate the irreparable harm requirement." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit. *See id.* at 103; *see also* Wright et al., *supra*, § 2948.1 (Irreparable injury is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction[.]"). That's why this circuit has held that a district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]" *Friendship Materials*, 679 F.2d at 105. Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.

*D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019).

This means (among other things) that although courts sometimes state that these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997), this statement is inexact. As plainly indicated in *Sumner Cty. Schools*, the third factor, irreparable injury, actually *is* a prerequisite. Indeed, "[t]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002).

When determining whether to issue a TRO, a court should focus on whether there is a threat of *immediate*, irreparable harm. Fed. R. Civ. P. 65(b)(1)(A) (requiring a court to examine, on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that *immediate* and irreparable injury, loss, or damage will result to the movant") (emphasis added); *see also Appliancesmart, Inc. v. Dematteo*, No. 2:18-CV-1729, 2018 WL 6727094, at *2

(S.D. Ohio Dec. 21, 2018) ("[A]lthough some courts would examine the four factors required for issuance of a preliminary injunction, a focus on the irreparability and immediacy of harm is all that is required." (internal quotation marks and citation omitted)); *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006) ("A temporary restraining order is an extraordinary remedy that generally is reserved for emergent situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm."). In sum, a TRO may be issued only where the harm to plaintiffs is both irreparable *and* immediate.

But where such a showing is made by the plaintiff, it carries great weight. In some cases, it can even overcome the lack of a showing of likelihood of success on the merits (which, as noted below, is usually fatal to the plaintiff's efforts). Specifically, the Sixth Circuit permits a district court, in its discretion, to grant a preliminary injunction or temporary restraining order "even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).

As just noted, in some cases a plaintiff can prevail even if the court does not affirmatively find that there *is* a likelihood of success on the merits. But if the court finds that there is *not* a likelihood of success on the merits, the plaintiff generally will not prevail, because "[a] finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F. 3d 620, 625 (6th Cir. 2000).

## ANALYSIS

Plaintiff argues that its requested TRO is supported by all of the factors a court considers when determining whether to issue a TRO. (Doc. No. 8 at 7). The Court below assess each such factor in turn.

1. <u>Likelihood of success on the merits</u>

Plaintiff contends that it has a strong likelihood of success on the claims asserted in the Complaint. (Doc. No. 8 at 7).

     *a. Count I: Inducement of breach of contract*

Tennessee Code Annotated § 47-50-109 creates a cause of action for inducement of breach of contract, which the statute refers to as "unlawful procurement of breach of contract."[5] To succeed on a claim of inducement of breach of contract a plaintiff must show:

> (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff.

*Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002); *see also TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987) (citations omitted).

A claim of inducement of breach of contract requires the existence of a three-party relationship (the plaintiff, the breaching party, and the inducing party), a requirement that reflects the principle that a party to a contract may not be liable for interference with the contract.[6] *See*

---

[5] Courts also refer to this claim as intentional interference with a contract.

[6] In the Motion, Plaintiff asserts that DuraSeal "induced three Ever-Seal workers—Stephen Brad Halfery [ ], Kevin Goggins [ ], and Tim Lucero [ ]—to breach their Confidentially Agreements with Ever-Seal by engaging in direct competition with Ever-Seal and using and disclosing Ever-Seal's Confidential Information and Materials, despite valid and enforceable non-competition and confidentiality clauses prohibiting such conduct." (Doc. No. 8 at 1). However, in its Memorandum in Support, in regard to Count One, Plaintiff frames its argument in terms of inducing Halferty's (and only Halferty's) breach. Even the subheadings in its argument as to Count One reference only Halfery.

*Cambio Health Sols., LLC v. Reardon*, 213 S.W.3d 785, 789 (Tenn. 2006) ("[The] basic principle under Tennessee law that a party to a contract cannot be liable for tortious interference with that contract."). "This principle correctly reflects the purpose of the tort of intentional interference [a.k.a., inducement of breach of contract], which is to deter *third parties* from interfering with the contractual relations of parties to a contract." *Id.* (emphasis added).

There appears to be a fundamental problem with Plaintiff's inducement-of-breach-of-contract claim. From the evidence currently in the record, it appears that for all intents and purposes Halferty is the only individual making decisions for DuraSeal. He testified in his deposition that he is the sole owner of DuraSeal. (Doc. No. 10-1 at 20). And Plaintiff asserts in support of its Motion for TRO that "DuraSeal would cease to exist or have any business without Halferty, its founder and CEO[.]" (Doc. No. 9 at 18). As sole owner and CEO of DuraSeal, Halferty presumptively is calling all (or nearly all) of the shots for DuraSeal. And Plaintiff does nothing to dispel this presumption; no other officer or decision maker for DuraSeal is mentioned in the Complaint or elsewhere in the record. Thus, though understanding that of course DuraSeal de jure exists separately from Halferty, the Court has trouble understanding how Halferty can appropriately be considered a distinct party (a party distinct from DuraSeal) induced by DuraSeal to breach his contract with Plaintiff. And Plaintiff does nothing to enlighten the Court on this point.

Furthermore, as discussed above, one of the elements of an inducement-of-breach-of-contract claim is that the breach was a proximate result of the defendant's conduct. In arguing that

---

(See Doc. No. 9 at 11 ("Halftery entered into a valid and enforceable Agreement with Ever-Seal.")); (*Id.* at 19 ("Halferty's breach was a proximate result of DuraSeal's conduct."). The only place in its argument section where Plaintiff even references Goggins's agreement or Lucero's agreement is in a footnote in its argument related to Count Two. (Doc. No. 9 at 22 n.12). The Complaint, in regard to Count One, likewise references only Halferty's agreement and conduct. (Doc. No. 1 at ¶¶ 80-98). Thus, when assessing whether Count One is likely to succeed on the merits, the Court addresses only Halferty's agreement and DuraSeal's alleged inducement of Halferty's breach of that agreement.

this element was satisfied in its Memorandum in Support, Plaintiff simply argues (and only argues) this:

> DuraSeal's inducement and encouragement of Halferty's conduct was a proximate cause of those breaches. Ver. Compl. ¶¶ 65-73. *See generally McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991) (proximate cause means that conduct was a "substantial factor" in bringing about the harm complained of and the harm "could have reasonably been foreseen or anticipated").

(Doc. No. 9 at 19). The paragraphs of the Complaint Plaintiff cites detail how Halferty breached his contract, but every reference to DuraSeal's purported causation of those actions is merely conclusory. For example, Plaintiff alleges that "DuraSeal intended for Halferty to engage in behavior that breached his contractual and fiduciary duties to Ever-Seal," that DuraSeal "intentionally and maliciously caused Halferty to engage in such conduct," and that Halferty performed such conduct "all at the intentional direction of DuraSeal." (Doc. No. 1 at ¶¶ 65, 70, 74). Plaintiff does not provide any factual allegations that demonstrate how it was the conduct of DuraSeal, and not Halferty's own conduct, that proximately caused Halferty to breach his contract. And judging by the record, Plaintiff likely would have trouble doing so, as it appears that Halferty simply *is* DuraSeal, and therefore, the three parties necessary for an inducement of breach of contract claim to succeed—the plaintiff, the breaching party, and the inducing party—simply do not exist, because the breaching party and interfering party are the same.

Relatedly, to the extent that Plaintiff represents to this Court that DuraSeal had "inten[tions]" that were anything other than Halferty's own intentions, or that DuraSeal "caused" anything not caused by Halferty's own (causal) conduct, the record to date suggests that Plaintiff is being less than straight with the Court. One potential rejoinder by Plaintiff on this point could be that: (a) there is a distinction between (i) Halferty's conduct undertaken (and intentions held) on his own behalf, and (ii) Halferty's conduct undertaken (and intentions held) on behalf of, *i.e.*,

as an agent of, DuraSeal; and (b) that the intentions and conduct of DuraSeal to which it here refers were those of Halferty serving specifically as an agent for DuraSeal. But the current record reflects, and Plaintiff suggests, no such distinction.

Thus, Plaintiff has not met its burden to demonstrate that its inducement-of-breach-of contract claim is likely to succeed on the merits.

This is, of course, a preliminary ruling of the Court, and the Court may be convinced otherwise that this type of relationship can somehow maintain a successful inducement breach of contract claim later in this lawsuit. However, Plaintiffs have not yet done so, and this weighs against granting Plaintiff injunctive relief on the basis of Count One.

### b. Count II: Intentional interference with business relations

In order to establish intentional (tortious) interference with business relations under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 3:17-cv-01095, 2020 WL 5797974, at *6 (M.D. Tenn. Sept. 29, 2020) (citing *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). Significantly, the claim can be based on either an existing business relationship or a prospective business relationship. *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *6 (M.D. Tenn. Apr. 2, 2020). The Court finds that Plaintiff has demonstrated a likelihood of success on each element of a claim for intentional interference with business relations.

Plaintiff argues that Ever-Seal has prospective business relationships with an identifiable class of third persons: "individuals and businesses in need of permanent wood and concrete sealing services; stated differently, Ever-Seal has prospective business relationships with potential customers purchasing its sealing services." (Doc. No. 7 at 13). Plaintiff does not identify any specific individuals or businesses fitting this description,[7] but it appears that such identification is not required for this particular cause of action. *See, e.g., Yoe v. Crescent Sock Co.*, No. 1:15-CV-3- SKL, 2015 WL 13847410, at * 13 (E.D. Tenn. Dec. 11, 2015) (explaining plaintiff need only identify "a class of third persons," and not specific persons, for prospective business relationships and finding allegations sufficient where plaintiff alleged defendant interfered with prospective classes of customers including outdoor retailers); *PPG Indus., Inc. v. Payne*, No. 3:10-CV-73, 2012 WL 1836314, at *4 (E.D. Tenn. May 21, 2012) (sufficient where counterclaim plaintiff identified prospective business relationship as potential paint-buying customers); *Assist-2-Sell, Inc. v. Assist-2-Build, LLC*, No. 1:05-CV-193, 2005 WL 3333276, at *7 (E.D. Tenn. Dec. 6, 2005) ("[A] plaintiff in Tennessee needs to identify 'specific third parties' for an *existing* business relationship but only a 'class of third persons' for *prospective* business relationships" which "does not require a plaintiff to identify specific individuals when making a tortious interference with prospective business relations claim."). Plaintiff is thus likely to succeed in establishing this element.

Plaintiff has further established that Halferty, as a former estimator and sales manager at Ever-Seal, possessed knowledge of Plaintiff's prospective business relationships. As an Ever-Seal employee, Halferty was directly responsible for communicating with prospective customers and

---

[7] On the other hand, as discussed below, without identifying the customer by name, Plaintiff does identify certain specific situations where DuraSeal allegedly interfered with Plaintiff's prospective business relations with the customer.

was directly involved in the company's sales. (Doc. No. 1 at ¶¶ 19-21, 25-28, 36, 89). Thus, the Court finds that Plaintiff is likely to succeed in showing that DuraSeal, through Halferty (its founder and CEO),[8] possessed knowledge of Plaintiff's prospective business relationships.

Plaintiff states that "DuraSeal has intended to cause a breach or termination of Ever-Seal's prospective business relationships by sabotaging sales on behalf of Ever-Seal, poaching and soliciting Ever-Seal's potential customers he learned of through his work for Ever-Seal and directing them to his separate competing company, using Ever-Seal's confidential and inside information to divert business to his separate competing company, and otherwise inducing potential customers to use DuraSeal's services rather than Ever-Seal's services. Ver. Compl. ¶¶ 41-57, 90-91; Ex. A, Lucero Decl., at ¶¶ 2-19." (Doc. No. 7 at 14). Thus, Plaintiff has shown that DuraSeal likely intended to cause the breach; the Court finds that Plaintiff has a strong likelihood of success on this element.

The Court finds that Plaintiff is also likely to succeed in showing that DuraSeal used improper means to interfere with Ever-Seal's prospective business relationships by "engaging in misrepresentations and deceit, misuse of inside or confidential information, unfair competition, breach of his contractual duties to Ever-Seal (including his non-compete clause and confidentiality clause), and breach of his fiduciary duties to Ever-Seal." (Doc. No. 7 at 14–15 (citing Ver. Compl. ¶¶ 41-57, 66-86, 91; Ex. A, Lucero Decl., at ¶¶ 2-19)). In *Trau-Med*, the Tennessee Supreme Court embraced a broad view of what can constitute improper motive and improper means. *Kolstad v. Leehar Distribs., LLC*, No. 3:18-cv-00060, 2018 WL 6832086, at *7 (M.D. Tenn. Dec. 28, 2018).

---

[8] Above, in a context (the analysis of Count One) that implicates Halferty's personal interests (in his own personal contract with Plaintiff) as distinguished from DuraSeal's interests, the Court has expressed skepticism that certain acts of Halferty are properly considered acts of DuraSeal as distinguished from acts of Halferty taken on his own behalf. But in the context of Count Two, where Halferty's personal interests are not implicated in the same way, the Court is satisfied that for purposes of Count Two (but not necessarily Count One), the acts of Halferty likely could be deemed the acts of DuraSeal.

Either improper motive or improper means will suffice. *Watson's Carpet and Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). The Court finds that Plaintiff's verified factual allegations of existing and prospective business relationships, DuraSeal's knowledge of those relationships, and DuraSeal's use of Ever-Seal's confidential information and direct competition with Plaintiff's prospective customers (in direct violation of the non-competition clause) show that DuraSeal likely acted with an improper motive and/or improper means with the specific intent to interfere with Plaintiff's business relationships.

Finally, Plaintiff has shown a strong likelihood of success in establishing damages resulting from DuraSeal's tortious interference. These likely damages include the loss of business, customer relationships, goodwill, profits, and administrative, marketing, recruiting, and training costs. (Doc. No. 1 at ¶¶ 58-65, 92-93).

Because the Court finds that Plaintiff will likely succeed in establishing each of these elements, Plaintiff has a strong likelihood of success on its intentional interference with business relations claim.

2. <u>Whether the plaintiff will suffer irreparable injury without the injunction</u>

Plaintiff argues that it will likely suffer "immediate and irreparable injury" without an injunction because (according to Plaintiff) DuraSeal will otherwise continue to commit "further breaches and further intentional interference." (Doc. No. 7 at 15). In the Verified Complaint, Plaintiffs provide examples of their potential customers that have already been stolen by DuraSeal:

> 67. For one example, in or around June 2021, Ever-Seal provided an estimate on a $75,000 job in Banner Elk, North Carolina; although Ever-Seal fielded the inquiry, set up the meeting, and provided the requisite information and estimate to the prospective client, Halferty utilized his role as sales manager to usurp the opportunity for DuraSeal by way of fraud and deception.

> 68. For another example, in or around December 2021, Ever-Seal received a call from a customer inquiring why the work on her home had not yet started when she

paid her deposit of $10,000 in October 2021; when Ever-Seal informed the customer that it did not find her project in its system, she inquired "doesn't Brad Halferty work for Ever-Seal?" As it turns out, Halferty utilized his relationship with Ever-Seal, and the information he learned from Ever-Seal, to underhandedly steer the opportunity to DuraSeal.

(Doc. No. 1 at ¶¶ 67-68). Plaintiffs assert that DuraSeal "has sourced at least 12 separate jobs directly from Ever-Seal, and he is continuing to advertise and sell DuraSeal's competing services in at least North Carolina, South Carolina, Georgia, and Florida." (Doc. No. 9 at 8; Doc. No. 1 at ¶¶ 95, 111). DuraSeal is obtaining customers through Halferty's unauthorized use, dissemination, and disclosure of Ever-Seal's confidential information (in breach of his non-compete and confidentiality agreement with Ever-Seal). (Doc. No. 1 at ¶ 73). Plaintiffs maintain that "DuraSeal's conduct has damaged and is continuing to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs." (Doc. No. 9 at 8; Doc. No. 1 at ¶¶ 76-79).

Competitive losses and losses of customer goodwill as a result of a defendant's actions "often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992). Additionally, the Sixth Circuit has found that the breach of a non-competition clause (such as the clause Halferty has breached) typically is likely to cause irreparable harm to an employer. *Id*. ("[T]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."); *see also Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant).

Plaintiff has shown that if DuraSeal is not enjoined from continuing to obtain customers through Halferty's unauthorized use, dissemination, and disclosure of Ever-Seal's confidential

information, Plaintiff is likely to continue suffering from irreparable injury "in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs." (Doc. No. 7 at 12). The Court finds that this likelihood of Plaintiff suffering from irreparable harm absent the issuance of an injunction to be adequately supported by the verified Complaint and the declaration accompanying the Motion. This factor—which, as noted above, is actually a *requirement*—thus weighs strongly in favor of granting the Motion.

3. <u>Whether granting the injunction will cause substantial harm to others</u>

Plaintiff asserts: "Here no harm to others will result from an injunction enforcing the terms of the Agreement and prohibiting DuraSeal's . . . intentional interference. The only third parties potentially affected by the injunction are prospective customers in need of permanent wood and concrete sealing services. Those prospective customers can still obtain permanent wood and concrete sealing services from Ever-Seal or other companies providing similar services. Accordingly, the requested relief will not harm, let alone substantially harm, any third parties." (Doc. No. 9 at 24-25). Plaintiff's assertion is well taken, except that Plaintiff here omits any reference to Halferty, who, consistent with the Court's footnote above, probably does count as a third party whose potential injury from a TRO must be considered. But it does not appear that Halferty's *legitimate* interests would be harmed by the scope of the TRO the Court contemplates, which would not prevent Halferty or his company (DuraSeal) from engaging in legitimate business activities.

The Court intends to craft an injunction would enjoin Defendant from doing things it should not be doing anyway (that is, tortiously interfering with Plaintiff's business relations). Further, Plaintiff has shown that it is likely to be substantially harmed by the short-term

continuation of such activities, because even DuraSeal's short-term engagement in poaching Plaintiff's customers and using Ever-Seal's confidential information will result in Plaintiff's lost business, customer relationships, profits, and so on. Thus, the Court agrees that the balance of harms weighs in favor of granting injunctive relief (to at least some extent) in the form of an appropriately tailored TRO.

    4.  <u>The injunction's impact on the public interest</u>

Plaintiff argues that "[n]o important public policies are implicated by the issuance of the requested injunctive relief in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations." (Doc. No. 9 at 25). The Court agrees. To begin with, this is at heart a private dispute, and the public at large has no particular stake in the outcome, *i.e.*, who wins and loses. *See Nat'l Viatical, Inc.*, 716 F.3d at 957 (finding that "harm to . . . the public [is] not significantly implicated here, because this is a private dispute between" the parties to the lawsuit).

The public does have an interest in certain imperatives implicated by the dispute, however, such as the sanctity of contracts and the protection of a business's right to enforce non-competition clauses to protect sensitive proprietary information and maintain customer relationships. Given Plaintiff's likelihood of success on the merits of claims that would vindicate these interests, the public interest weighs in favor of granting the Motion.

<b><u>CONCLUSION</u></b>

For all these reasons, Plaintiff's Motion for Temporary Restraining Order will be granted on the basis that Plaintiff is likely to succeed on the merits of its tortious interference with a business relationship claim. Accordingly, the Court will enter a temporary restraining order as to the second category of Plaintiff's requested injunctive relief, which requested enjoining DuraSeal

from "engaging in conduct that constitutes intentional interference with Ever-Seal's business relations."[9] (Doc. No. 11 at 1). **However, prior to the Court issuing a temporary restraining order, Plaintiff must file, on or before June 2, 2022, a supplemental filing that proposes language that more specifically describes what conduct shall be enjoined (*i.e.*, what particular actions and with what persons those particular actions are prohibited).**

As required by Fed. R. Civ. P. 65(b)(2), the Court finds that Plaintiff has established the notice requirements for *ex parte* issuance of a temporary restraining order.[10] The Court further finds *ex parte* issuance appropriate under the present circumstances given the indication of the likelihood of irreparable harm ongoing day by day and the fact that the record in no way suggests that DuraSeal has retained counsel in this matter who could be provided prompt notice in order to respond to the Motion.

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, "the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v.*

---

[9] The Plaintiff's first category of requested injunctive relief (*i.e.*, enjoining DuraSeal from "inducing anyone who entered into a Confidentiality Agreement with Ever-Seal to breach that agreement") will not be granted, because the Court has found that Plaintiff has not established a likelihood of success on the merits of its inducement-of-breach-of-contract claim. (Doc. No. 11 at 1).

[10] Plaintiff's counsel writes the following, and the Court agrees:

> Issuance of the requested relief is warranted even without notice to Defendant because the specific facts presented in the Verified Complaint and Declaration of Tim Lucero and Steve Nelson, as well as the attached deposition and hearing excerpts, clearly show that immediate and irreparable injury, loss, or damage will result to Ever-Seal before Defendant can be heard in opposition. Any harm to Defendant resulting from issuance of a temporary restraining order without prior notice is minimal and alleviated by the short-term nature of such relief, the security required under Fed. R. Civ. P. 65(c), and the opportunity to move to dissolve the order as stated in Fed. R. Civ. P. 65(b)(4).

(Doc. No. 8 at 2).

*EaglePicher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. *Id*. at 1176. Under the circumstances of this case, the Court finds that the inevitability of harm to Defendant in the event the TRO proves to have been improvidently granted, the likely approximate amount of damages from such harm, the countervailing strength of Plaintiff's case, and the public interest favor the requirement that Plaintiff post a security bond in the amount of $10,000.00.

The Court therefore will require Plaintiff to post security in the amount of ten thousand dollars ($10,000.00), in a form satisfactory to the Clerk of Court prior to the issuance of the TRO. A hearing to consider Plaintiff's Motion for Preliminary Injunction will be set after the TRO is entered.

Although the Court has opined herein that Plaintiff has established that it is likely to succeed on the merits of one claim, and has not established that it is likely to succeed on the merits of another claim, it realizes that this view is merely preliminary and based on the current record and that Plaintiff may or may not ultimately succeed on the merits of either claim.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE