# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| EVER-SEAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00365 |
| | ) | Judge Richardson |
| DURASEAL, INC., | ) | Mag. Judge Holmes |
| | ) | |
| Defendant. | ) | JURY DEMAND |

## FIRST AMENDED COMPLAINT

Plaintiff Ever-Seal, Inc. ("Ever-Seal"), by and through undersigned counsel, submits this First Amended Complaint against Defendant DuraSeal, Inc. ("DuraSeal"), and states and alleges as follows:

### I. INTRODUCTION

1.      In late December 2021 and early January 2022, Ever-Seal learned that its former sales manager, Stephen Bradley Halferty ("Halferty"), started competing with Ever-Seal under the name DuraSeal months prior to his termination from Ever-Seal and utilizing Ever-Seal's confidential and inside information in order to do so, even despite Halferty's valid and enforceable Confidentiality Agreement with Ever-Seal prohibiting such conduct.

2.      In February 2022, Ever-Seal filed suit against Halferty d/b/a DuraSeal to attempt to enjoin Halferty's ongoing misconduct and recover damages for the resulting harm caused to Ever-Seal (M.D. Tenn. Case No. 3:22-cv-00082).

3.      After the Court issued a temporary restraining order, Ever-Seal became aware that Halferty had filed for personal Chapter 13 bankruptcy in mid-January 2022. Ever-Seal promptly notified the Court and Ever-Seal's case against Halferty was stayed.

4.      It was not until May 5, 2022, while being deposed in an adversary proceeding, that Halferty first confirmed under oath that DuraSeal is indeed an S-Corporation rather than merely Halferty's d/b/a and that he filed incorporation papers for DuraSeal in Delaware in June or July 2021.

5.      Although Halferty filed for Chapter 13 bankruptcy, DuraSeal is an independent legal entity that has not filed bankruptcy.

6.      In light of this and other information recently learned, Ever-Seal has reason to believe that DuraSeal, by and through Halferty acting as an agent for DuraSeal and others, began tortiously interfering with Ever-Seal's contracts and prospective business relations in at least June 2021 and has continued to do so all at times since then.

7.      Such interference includes surreptitiously stealing prospective clients and usurping business opportunities from Ever-Seal for the benefit of DuraSeal through various forms of lies, deceit, self-promotion, and underhanded tactics, and utilizing Ever-Seal's confidential and inside information, as well as workers, in order to do so.

8.      DuraSeal interfered with Ever-Seal's contracts by inducing at least two Ever-Seal workers beyond Halferty – Kevin Goggins and Tim Lucero – to breach their Confidentiality Agreements with Ever-Seal, including the non-competition and confidentiality clauses contained in those Agreements.

9.      DuraSeal recruited another worker trained by Halferty at Ever-Seal – Bailie Morlidge – to work for DuraSeal using the information and training that he received from Ever-Seal.

10.      DuraSeal interfered, and is continuing to interfere, with Ever-Seal's prospective business relationships by using improper motives and means to divert Ever-Seal's prospective

NSH 2485024.6

customers away from Ever-Seal and to DuraSeal, including but not limited to misrepresentations and deceit, misuse of inside or confidential information, breaches of contract, breach of a fiduciary relationship, unfair competition, overreaching, and sharp dealing.

11.     As a result of these breaches and DuraSeal's interference, Ever-Seal has lost business, profits, opportunities, customer relationships, and goodwill.

12.     Such harm is ongoing, irreparable, and increasing each day as Ever-Seal is currently in the middle of its busiest season, when people are outdoors spending more time on their decks and patios.

13.     Ever-Seal brings the present action to halt the immediate, ongoing, and irreparable harm caused by DuraSeal's misconduct, to attempt to recover the losses caused by it, and to enjoin DuraSeal from engaging in such conduct in the future.

## II. PARTIES

14.     Ever-Seal is a Tennessee corporation with its principal place of business located at 242 W. Main St., Suite 311, Hendersonville, TN 37075.

15.     Ever-Seal provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States, including service areas in Alabama, Georgia, Indiana, North Carolina, South Carolina, Kentucky, Tennessee, and Virginia.

16.     DuraSeal is a Delaware corporation with its principal place of business in North Carolina.

17.     DuraSeal provides wood and concrete restoration and permanent sealing services to individuals and businesses in North Carolina, South Carolina, Florida, and Georgia.

18.     DuraSeal was formed by Halferty in approximately June 2021.

19.     Upon information and belief, Halferty began taking steps to form DuraSeal prior to June 2021.

20.     Halferty, a non-party to this proceeding, is a citizen and resident of North Carolina who worked for Ever-Seal from May 2020 to November 2021 and DuraSeal from approximately June 2021 to present.

21.     From approximately June 2021 through late November 2021, Halferty secretly and surreptitiously worked for DuraSeal, where he still works.

22.     On or about January 14, 2022, Halferty filed for Chapter 13 in the United States Bankruptcy Court for the Eastern District of North Carolina, Raleigh Division, and his bankruptcy case is still pending.

### III.  JURISDICTION & VENUE

23.     This Court has specific personal jurisdiction over DuraSeal because DuraSeal's activities and contacts in Tennessee give rise to this cause of action.  For example, upon information and belief, DuraSeal purchased its chemicals to unlawfully compete against Ever-Seal from the same supplier Ever-Seal uses in Nashville.  DuraSeal was formed and is unlawfully competing with Ever-Seal based on information and knowledge gained from Halferty's training at Ever-Seal, including a week of appointments in Nashville, where he gained on-the-job experience and knowledge of Ever-Seal's business, customers, and potential customers.  Additionally, DuraSeal encouraged Goggins and Lucero to breach the confidentiality and non-compete provisions of their Agreements with Ever-Seal by using information and knowledge gained from their training and working relationship with Ever-Seal, which was based in Tennessee and governed by Tennessee agreements.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these causes of action occurred in the Middle District of Tennessee, DuraSeal is subject to personal jurisdiction in the Middle District of Tennessee as stated herein, and Ever-Seal resides in the Middle District of Tennessee.

25.     This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount at controversy exceeds $75,000 exclusive of interest and costs.

## IV.  FACTUAL ALLEGATIONS

**Ever-Seal Background**

26.     Ever-Seal is a Tennessee corporation formed in 2018 that provides wood and concrete restoration and permanent sealing services.

27.     Ever-Seal utilizes a one-time sealant solution called "Seal-It" that is backed by a 25-year manufacturer's warranty.

28.     Ever-Seal is one of only approximately five companies in the United States authorized to offer and install manufacturer-warranted Seal-It.

29.     Seal-It is a penetrant that requires specialized processes in order to accurately and permanently seal exterior wood or concrete.

30.     Since its inception, Ever-Seal has developed certain confidential and proprietary processes, applications, and materials beyond those dictated by the manufacturer in order to set Ever-Seal apart from its competition.

**Ever-Seal Relationship with Halferty**

31.     On or about May 26, 2020, Ever-Seal hired Halferty as an estimator for its sales territory in and around Raleigh, North Carolina.

32. In his role as estimator, Halferty was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.

33. At the end of the sales appointments, Halferty would provide his Ever-Seal business card to prospective clients for future correspondence.

34. Halferty had no prior experience in the concrete and wood sealing industry when he was hired by Ever-Seal.

35. Ever-Seal trained Halferty on Ever-Seal's unique products, processes, and methods for applying its permanent sealing solution.

36. Ever-Seal showed Halferty what chemicals it used for specific jobs and what order to apply them in, and even introduced him to Ever-Seal's vendors and suppliers, which information and relationships Halferty did not have prior to working at Ever-Seal.

37. Ever-Seal further trained Halferty on how to do Ever-Seal's sales presentation, use Ever-Seal's sample and testing materials, measure to accurately bid projects, complete Ever-Seal paperwork, answer prospective customer questions, and perform other general functions involved in the day-to-day tasks of an Ever-Seal sales representative.

38. Although Halferty's primary sales territory was based in a 100-mile radius from Raleigh, North Carolina, he worked wherever Ever-Seal scheduled him, including in Virginia, Kentucky, Indiana, Georgia, and South Carolina.

39. In late 2020, Ever-Seal promoted Halferty to sales manager.

40. In his role as sales manager, Halferty was responsible for assisting sales representatives in each Ever-Seal market area at the direction of Ever-Seal management and per

Ever-Seal standards, in addition to overseeing his assigned territory in Raleigh, North Carolina and continuing to run the sales appointments assigned to him by Ever-Seal.

41.     Halferty's duties as sales manager included, among others, reviewing each sale as it came in to ensure accuracy before forwarding it to the operations manager, training each new estimator in the new hire's territory, working with each sales team member quarterly for at least one full day in the team members' territory to provide additional training and support, and responding to customer complaints and resolution plans pertaining to estimates.

42.     In his role as sale manager, Halferty was responsible for recruiting and interviewing potential candidates who applied to Ever-Seal on platforms such as Indeed.com.

43.     In his role as sales manager, Halferty assisted in getting any new hires to sign paperwork, including the Confidentiality Agreement.

44.     In his role as sales manager, Halferty had broad access to Ever-Seal's systems and data, including but not limited to Ever-Seal's G-Suite application by and through which Halferty could see historical and future appointment information for the entire sales and operations teams.

45.     In his role as sales manager, Halferty learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price.

46.     In both roles, Halferty had the authority to act on behalf of Ever-Seal for the benefit of Ever-Seal, but Ever-Seal controlled the methods and manner by which Halferty accomplished his work.

47.     In both roles, Halferty was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new customer relationships and business for Ever-Seal.

48. At the commencement of his working relationship with Ever-Seal, Halferty executed a Confidentiality Agreement ("Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

49. The Agreement includes a non-competition clause that prohibits Halferty from competing against Ever-Seal for a period of two years following his termination from Ever-Seal. Ex. A, at ¶ 3.

50. The Agreement further includes a confidentiality clause that prevents Halferty's unauthorized use, disclosure, and dissemination of Ever-Seal's Confidential Information and Materials, both during his working relationship with Ever-Seal and for a period of two years thereafter. *Id.* at ¶¶ 3-5.

51. The Agreement defines "Confidential Information" as:

Confidential Information means information disclosed by [Ever-Seal] to [Halferty], or its agents, employees and/or independent contractors, in any manner, that is not generally known in the industry in which [Ever-Seal] is engaged, about its business and which [Ever-Seal] desires to be kept confidential. As to Ever-Seal, Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative, management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

*Id.* at ¶ 1.

52. The Agreement defines "Confidential Materials" as:

Confidential Materials includes all physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

*Id.* at ¶ 2.

53. Within the Agreement, Halferty acknowledged that he "is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with [his

NSH 2485024.6

work for Ever-Seal] and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature." *Id.* at ¶ 3.

54.  The Agreement states that "compliance with the terms of this Agreement is necessary to protect the business and good will of each party" and "a breach of this Agreement will irreparably and continually damage the other and that an award of monetary damages will not be adequate to remedy such harm" such that Ever-Seal "shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of monetary damages, insofar as they can be determined, including without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement." *Id.* at ¶ 8.

55.  In his role as sales manager, Halferty was aware that each new hire at Ever-Seal signed the same Agreement, containing the same non-compete and confidentiality clauses, and he even helped Ever-Seal present the Agreement to new hires.

56.  During the course of Halferty's working relationship with Ever-Seal, Ever-Seal provided him with access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; Ever-Seal's unique and proprietary truck design and

functionality; Ever-Seal's financial information including but not limited to its year-to-date sales information for every sales representative at the company; and Ever-Seal's pricing information.

57.     Around November 22, 2021, Ever-Seal terminated its relationship with Halferty based on Halferty failing to show up to scheduled appointments with customers.

58.     On or about November 25, 2021, Ever-Seal requested in writing that Halferty return all Confidential Materials it had provided him (i.e. the physical embodiments of Ever-Seal's Confidential Information).

59.     Halferty failed and refused to return Ever-Seal's Confidential Materials, including but not limited to Ever-Seal's custom sales cases, presentation materials, sample materials, testing materials, marketing materials, and confidential forms and spreadsheets.

**DuraSeal, Inc.**

60.     Ever-Seal learned in late December 2021 and early January 2022 that Halferty was doing business as DuraSeal, which competes directly against Ever-Seal for business.

61.     As it turns out, Halferty had been working for DuraSeal and surreptitiously competing with Ever-Seal since approximately June 2021, five months prior to his termination from Ever-Seal.

62.     Ever-Seal does not know the full extent of Halferty's conduct and actions taken to assist DuraSeal in its competition with Ever-Seal, but Halferty engaged in at least the following actions, all for the benefit of DuraSeal and without Ever-Seal's knowledge or authority, while still working for Ever-Seal:

        a.      Halferty utilized his role with Ever-Seal to poach leads for DuraSeal;

        b.      Halferty utilized his role with Ever-Seal to poach operations and sales staff for DuraSeal;

c.     Halferty attended Ever-Seal sales appointments with prospective customers and unbeknownst to the customer or Ever-Seal directed the work to DuraSeal; he directed the easier jobs to DuraSeal and the more complex, difficult, or undesirable jobs to Ever-Seal;

d.     Halferty attended Ever-Seal sales appointments with prospective customers and purposely did not make the sale on behalf of Ever-Seal but, instead, utilized the meeting to sabotage Ever-Seal's chances and/or otherwise learn information to secure the sale for DuraSeal (such as by bidding the project high, refusing to do the proper or full sales presentation, being unfriendly, etc.);

e.     Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal would complete the project sooner or for a fraction of the price bid by Ever-Seal;

f.     Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal, unlike Ever-Seal, was a local company;

g.     Halferty guided customers into contracts with DuraSeal, only after securing the meeting with them through his work at Ever-Seal or otherwise becoming aware of them through his work with Ever-Seal, and those customers would have entered into contracts with Ever-Seal but for his interference and misconduct;

h.     Halferty personally attended DuraSeal sales appointments and attempted to sell on behalf of DuraSeal the same services offered by Ever-Seal in the same region;

i.     Halferty utilized information from Ever-Seal files and databases to secure the project for DuraSeal where Ever-Seal and DuraSeal submitted competing bids on the same project;

j.     Halferty, in his role as sales manager, encouraged or assisted Ever-Seal sales representatives to sabotage Ever-Seal sales presentations for the benefit of DuraSeal, such as by purposely bidding the project high, and would offer monetary incentives to do so;

k.     Halferty encouraged or assisted other Ever-Seal sales representatives to cover his Ever-Seal sales appointments so that he could sell the same project on DuraSeal;

l.     Halferty failed to attend his assigned Ever-Seal sales appointments for the benefit of DuraSeal.

63.     Ever-Seal does not know the full extent of Halferty's unauthorized use, dissemination, and/or disclosure of Ever-Seal's Confidential Information and Materials but Halferty engaged in at least the following actions, all for the benefit of DuraSeal, both during the term of his working relationship with Ever-Seal and within the two year period thereafter:

a.     Used and/or continues to use Ever-Seal's unique techniques, products, and processes for sealing wood and concrete to do business for DuraSeal;

b.     Used and/or continues to use Ever-Seal's private information on leads, inquiries, and prospective customer relationships to acquire business for DuraSeal;

c.     Used and/or continues to use Ever-seal's private bid information to acquire business for DuraSeal;

d.     Used and/or continues to use Ever-Seal's sales presentation book, or portions thereof, in his presentations to prospective customers on behalf of DuraSeal;

e.     Used and/or continues to use Ever-Seal's photographs from Ever-Seal jobs in his marketing materials on behalf of DuraSeal;

f.     Used or/or continues to use marketing research paid for by Ever-Seal, for Ever-Seal, to obtain new business for DuraSeal;

g.      Used and/or continues to use recruiting drives paid for by Ever-Seal, for Ever-Seal, to staff the DuraSeal brand;

h.      Used and/or continues to use Ever-Seal's proprietary truck design and functionality in his business with DuraSeal.

64.     Halferty continues to work for and advise DuraSeal within the two-year period following his termination from Ever-Seal.

**Ever-Seal Relationship with Goggins**

65.     On or about November 11, 2020, Ever-Seal hired Kevin Goggins ("Goggins) as an installer and he later transitioned to an estimator for Ever-Seal's sales territory in and around Nashville, Tennessee.

66.     In his role as installer, Goggins was responsible for sealing and restoring concrete and wood surfaces on customer property.

67.     In his role as estimator, Goggins was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.

68.     At the end of the sales appointments, Goggins would provide his Ever-Seal business card to prospective clients for future correspondence.

69.     Ever-Seal trained Goggins on Ever-Seal's unique products, processes, and methods for applying its permanent sealing solution.

70.     Ever-Seal showed Goggins what chemicals it used for specific jobs and what order to apply the products.

71. Ever-Seal further trained Goggins on how to complete Ever-Seal paperwork, answer prospective customer questions, and perform other general functions involved in the day-to-day tasks of an Ever-Seal installer.

72. In his role as installer and estimator, Goggins had the authority to act on behalf of Ever-Seal for the benefit of Ever-Seal, but Ever-Seal controlled the methods and manner by which Goggins accomplished his work.

73. In his role as installer and estimator, Goggins was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to maintain customer relationships and business for Ever-Seal.

74. At the commencement of his working relationship with Ever-Seal, Goggins executed the same Agreement as described and outlined in Paragraphs 49-53 above.

75. Goggins's Agreement includes the same non-competition clause and confidentiality clause as described in Paragraphs 49-53 herein.

76. A true and correct copy of the Goggins Agreement is attached hereto as **Exhibit B**

77. During the course of his working relationship with Ever-Seal, Ever-Seal provided Goggins access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customers; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's pricing information.

78.     Upon information and belief, starting in approximately May 2021, DuraSeal began recruiting Goggins to leave Ever-Seal and work for DuraSeal.

79.     In May 2021, Goggins left Ever-Seal and began working for DuraSeal.

80.     Upon information and belief, Goggins utilizes the same or substantially similar sales processes and presentation materials as he did at Ever-Seal to pitch DuraSeal's products to potential customers.

81.     Upon information and belief, Goggins utilizes Ever-Seal's unique and proprietary truck design and functionality to build DuraSeal's production trailers.

82.     Upon information and belief, Goggins remains employed as a sales representative, or similarly situated position, with DuraSeal.

83.     Goggins continues to work for and advise DuraSeal within the two-year period following his departure from Ever-Seal.

**Ever-Seal Relationship with Lucero**

84.     On or about April 2021, Ever-Seal hired Tim Lucero ("Lucero") as an estimator for its sales territory in and around Kentucky.

85.     In his role as estimator, Lucero was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.

86.     At the end of the sales appointments, Lucero would provide his Ever-Seal business card to prospective clients for future correspondence.

87.     Lucero had no prior experience in the concrete and wood sealing industry when he was hired by Ever-Seal.

88. Ever-Seal trained Lucero on Ever-Seal's unique products, processes, and methods for applying its permanent sealing solution.

89. Ever-Seal showed Lucero what chemicals it used for specific jobs and what order to apply them in.

90. Ever-Seal further trained Lucero on how to do Ever-Seal's sales presentation, use Ever-Seal's sample and testing materials, measure to accurately bid projects, complete Ever-Seal paperwork, answer prospective customer questions, and perform other general functions involved in the day-to-day tasks of an Ever-Seal sales representative.

91. In his role as estimator, Lucero had the authority to act on behalf of Ever-Seal for the benefit of Ever-Seal, but Ever-Seal controlled the methods and manner by which Lucero accomplished his work.

92. In his role as estimator, Lucero was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new customer relationships and business for Ever-Seal.

93. At the commencement of his working relationship with Ever-Seal, Lucero executed the same Agreement as described and outlined in Paragraphs 49-53 above.

94. Lucero's Agreement includes the same non-competition clause and confidentiality clause as described in Paragraphs 49-53 herein.

95. During the course of his working relationship with Ever-Seal, Ever-Seal provided Lucero access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customers; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's methods for providing

services efficiently and at an affordable price; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's pricing information.

96.    DuraSeal recruited Lucero to leave Ever-Seal and work for DuraSeal.

97.    In October 2021, Lucero left Ever-Seal and began working for DuraSeal.

98.    Lucero worked for DuraSeal from approximately October 2021 to January 2022.

99.    Lucero utilized the same or substantially similar sales processes and presentation materials as he did at Ever-Seal to pitch DuraSeal's products to potential customers.

100.    Lucero worked for or advised DuraSeal within the two-year period following his departure from Ever-Seal.

**Ever-Seal Relationship with Morlidge**

101.    In February 2021, Bailie Morlidge ("Morlidge") applied to be an estimator for Ever-Seal in North Carolina.

102.    In his role as sales manager at Ever-Seal, Halferty directed Morlidge's interview process with Ever-Seal.

103.    Months later, around July 2021, Halferty arranged for Morlidge to receive approximately five to seven days of training at Ever-Seal with Perrigo and Halferty.

104.    During these trainings conducted by Ever-Seal, Morlidge observed sales presentations to customers and learned of Ever-Seal's application methods and processes.

105.    Despite not signing a Confidentiality Agreement, Morlidge received the benefit of Ever-Seal's Confidential Information and Materials through training with Ever-Seal.

106.    Ever-Seal prohibits individuals who are not subject to a Confidentiality Agreement to observe or train using Ever-Seal materials.

107. Morlidge was never offered a position with Ever-Seal.

108. Upon information and belief, Halferty never informed Ever-Seal's CEO of the fact that Morlidge had applied for a job or had received training at Ever-Seal.

109. Morlidge was offered a position with DuraSeal.

110. Upon information and belief, Morlidge is employed by DuraSeal, doing direct customer outreach and sale presentations to gain business for DuraSeal in direct competion with Ever-Seal.

111. Upon information and belief, Morlidge is utilizing the training and/or Confidential Information and Materials he received as part of training from Ever-Seal to conduct business for DuraSeal.

**DuraSeal's Misconduct**

112. Halferty started DuraSeal in approximately June 2021, while he was still working with Ever-Seal and approximately five months before Ever-Seal terminated him.

113. Halferty kept DuraSeal's creation and existence a secret from Ever-Seal's founder and CEO, Steve Nelson.

114. DuraSeal competes directly with Ever-Seal.

115. DuraSeal, like Ever-Seal, provides permanent sealing services for wood and concrete backed by a 25-year warranty.

116. DuraSeal, like Ever-Seal, utilizes Seal-It for its sealing solution.

117. DuraSeal, like Ever-Seal, utilizes specific non-sealant chemicals for it services, which it obtains (or has obtained) from a specific supplier in Nashville.

118. DuraSeal would not have known about these materials or suppliers but for Halferty's work with Ever-Seal, which was subject to the Agreement.

119.    DuraSeal, like Ever-Seal, markets in at least North Carolina, South Carolina, and Georgia.

120.    DuraSeal, like Ever-Seal, provides services in at least North Carolina, South Carolina, and Georgia.

121.    DuraSeal utilized Halferty's relationship with Ever-Seal and the Confidential Information and Materials that he learned from Ever-Seal to divert business from Ever-Seal to DuraSeal, and DuraSeal began doing so while Halferty was still working for Ever-Seal.

122.    DuraSeal utilized Goggins' and Lucero's relationship with Ever-Seal and the Confidential Information and Materials that they learned from Ever-Seal to not only divert business away from Ever-Seal to DuraSeal but to also avoid the necessary costs of training new estimators on the sales presentation, materials, and processes of the services now offered by DuraSeal in direct competition with Ever-Seal.

123.    DuraSeal utilized Ever-Seal's recruitment and hiring platform, as well as Confidential Information and Materials, to not only divert applicants away from Ever-Seal to DuraSeal but also to avoid the necessary cost of training new estimators on the sales presentation, materials, and processes of the services now offered by DuraSeal in direct competition with Ever-Seal.

124.    DuraSeal intended for Halferty, Goggins, and Lucero to engage in behavior that breached their contractual and fiduciary duties to Ever-Seal in order to assist DuraSeal with its unlawful competition.

125.    DuraSeal maliciously induced Halferty, Goggins, and Lucero to engage in such conduct to injure Ever-Seal and to benefit DuraSeal at the expense of Ever-Seal in its competing business.

126.    For one example, in or around June 2021, Ever-Seal provided an estimate on a $75,000 job in Banner Elk, North Carolina; although Ever-Seal fielded the inquiry, set up the meeting, and provided the requisite information and estimate to the prospective client, Halferty utilized his role as Ever-Seal sales manager to usurp the opportunity for DuraSeal by way of fraud and deception.

127.    For another example, in or around December 2021, Ever-Seal received a call from a customer inquiring why the work on her home had not yet started when she paid her deposit of $10,000 in October 2021; when Ever-Seal informed the customer that it did not find her project in its system, she inquired "doesn't Brad Halferty work for Ever-Seal?" As it turns out, Halferty utilized his relationship with Ever-Seal, and the information he learned from Ever-Seal, to underhandedly steer the opportunity to DuraSeal.

128.    But for DuraSeal's interference, these jobs would have gone to Ever-Seal.

129.    DuraSeal competed and continues to compete directly against Ever-Seal by submitting bids on the same projects, marketing in the same territories, and offering the same permanent sealing services utilizing the same product, processes, and representations.

130.    DuraSeal utilized and continues to utilize Ever-Seal's Confidential Information and Materials to compete unfairly with Ever-Seal.

131.    For example, during Ever-Seal sales appointments on February 8, May 4, and May 25, 2022, prospective customers stopped the Ever-Seal estimator mid presentation and stated they had already seen the exact same presentation, including the same slides, from DuraSeal prior to the meeting.

132.    DuraSeal utilized and continues to utilize Halferty, Goggins, and Lucero's relationship with Ever-Seal and the training and knowledge that Halferty, Goggins, and Lucero

received from Ever-Seal, including Ever-Seal's Confidential Information and Materials, to compete unfairly with Ever-Seal, driving customers away from Ever-Seal and to DuraSeal.

### Ever-Seal Has Been Damaged

133. Ever-Seal has been damaged as a result of DuraSeal's conduct as described herein, including lost business and profits, a significant reduction in Ever-Seal's ratio of leads to estimates, and failure to satisfy test marketing sales expectations in North Carolina.

134. Upon information and belief, DuraSeal has sourced over 40 specific jobs directly from Ever-Seal's customers and identifiable potential customers that would have gone to Ever-Seal but for DuraSeal's interference.

135. Ever-Seal has further lost, and continues to lose, prospective customer relationships, goodwill, and fair competition as a result of DuraSeal's intentional interference.

136. In addition, Ever-Seal has expended, and continues to expend, attorney's fees and litigation costs that it would not have otherwise expended as a result of DuraSeal's misconduct.

## V.  CLAIMS

### COUNT I – INDUCEMENT OF BREACH OF CONTRACT - GOGGINS

### (in violation of Tennessee Code Annotated § 47-50-109)

137. Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its First Amended Complaint.

138. On November 11, 2020, Goggins entered into a Confidentiality Agreement ("Goggins Agreement") with Ever-Seal, a true and correct copy of which is attached as **Exhibit B.**

139. The Goggins Agreement is an enforceable contract between Ever-Seal and Goggins.

140.    DuraSeal, by and through its relationship with Halferty, was aware of the Goggins Agreement.

141.    The Goggins Agreement states in part:

[E]mployees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

Ex. B, at ¶ 3.  Plaintiff hereinafter refers to this provision as the "**Non-Compete Clause**."

142.    The Non-Compete Clause is an enforceable agreement between Ever-Seal and Goggins.

143.    DuraSeal intentionally interfered with the Goggins Agreement by inducing and hiring Goggins to work for DuraSeal, which competes directly with Ever-Seal, within the two-year period following his departure from Ever-Seal in May 2021, in breach of the Non-Compete Clause.

144.    DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Non-Compete Clause.

145.    As a proximate result of DuraSeal's tortious interference with the Goggins Agreement, Goggins materially breached (and continues to materially breach) the Non-Compete Clause by working for DuraSeal.

146.    The Goggins Agreement further provides that Goggins "shall use any Confidential Information and Materials received [from Ever-Seal] solely in connection with [his work for Ever-Seal]" and that, during his working relationship with Ever-Seal and for two years after, he "will never, directly or indirectly, use, disseminate, disclose or otherwise divulge any Confidential Information or Confidential Material" and "shall prevent any unauthorized disclosure of

Confidential Information or Materials by [his] employees, agents or independent contractors." Ex. B, at ¶¶ 3, 5. Plaintiff refers to these provisions as the "**Confidentiality Clause**."

147. The Confidentiality Clause is an enforceable agreement between Ever-Seal and Goggins.

148. DuraSeal tortiously interfered with the Goggins Agreement by inducing and directing Goggins to breach the Confidentiality Clause by encouraging Goggins to use Ever-Seal's Confidential Information and Materials for the benefit of DuraSeal and disclose Ever-Seal's Confidential Information and Materials to DuraSeal to compete against Ever-Seal.

149. DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Confidentiality Clause.

150. As a proximate result of DuraSeal's tortious interference with the Agreement, Goggins materially breached (and continues to breach) the Confidentiality Clause by using Ever-Seal's Confidential Information and Materials for the benefit of DuraSeal and disseminating, disclosing, or otherwise divulging Ever-Seal's Confidential Information and Materials to DuraSeal for the purpose of competing against Ever-Seal within the two-year period following his May 2021 departure from Ever-Seal.

151. Such Confidential Information and Materials include but are not limited to Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; and Ever-Seal's unique and proprietary truck design.

152. These Confidential Information and Materials are secret, business-related, and afford Ever-Seal a competitive advantage.

153.     As a result of DuraSeal's misconduct, Ever-Seal has suffered harm and damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

154.     Additionally, as a result of DuraSeal's misconduct, Ever-Seal has suffered immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and good will.

155.     DuraSeal's tortious interference with the Goggins Agreement has further forced Ever-Seal to engage in litigation to protect its business interests and enforce its rights under the Agreement; had DuraSeal not induced Goggins to breach his agreement, then Ever-Seal would not have incurred attorneys' fees and litigation expenses.

156.     Ever-Seal is entitled to a judgment against DuraSeal awarding Ever-Seal compensatory damages in an amount to be determined at trial, including attorney fees and litigation expenses under the independent tort theory, and treble damages under Tenn. Code Ann. § 47-50-109; and granting a temporary restraining order, temporary injunction, and permanent injunction prohibiting DuraSeal from entering into (or continuing) any employment, contractual, or advisory relationship with Goggins and from using, disclosing, or disseminating Ever-Seal's Confidential Information and Materials for a period of two years from the date the ongoing breaches stop.

## COUNT II – INDUCEMENT OF BREACH OF CONTRACT - LUCERO
### (in violation of Tennessee Code Annotated § 47-50-109)

157.     Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its First Amended Complaint.

158.     In or around April 2021, Lucero entered into a Confidentiality Agreement ("Lucero Agreement") with Ever-Seal.

159.    The substance of the Lucero Agreement is identical to the substance of the Halferty and Goggins Agreements attached as Exhibit A and Exhibit B.

160.    The Lucero Agreement is an enforceable contract between Ever-Seal and Lucero.

161.    DuraSeal, by and through its relationship with Halferty, was aware of the Lucero Agreement.

162.    The Lucero Agreement contained the same "Non-Compete Clause" as stated above.

163.    The Non-Compete Clause is an enforceable agreement between Ever-Seal and Lucero.

164.    DuraSeal intentionally interfered with the Lucero Agreement by inducing and hiring Lucero to work for DuraSeal, which competes directly with Ever-Seal, within the two-year period following his October 2021 departure from Ever-Seal, in breach of the Non-Compete Clause.

165.    DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Non-Compete Clause.

166.    As a proximate result of DuraSeal's tortious interference with the Lucero Agreement, Lucero materially breached the Non-Compete Clause by working for DuraSeal.

167.    The Lucero Agreement further contained the same "Confidentiality Clause" as stated above.

168.    The Confidentiality Clause is an enforceable agreement between Ever-Seal and Lucero.

169.    DuraSeal tortiously interfered with the Lucero Agreement by inducing and directing Lucero to breach the Confidentiality Clause by encouraging Lucero to use Ever-Seal's

Confidential Information and Materials for the benefit of DuraSeal and disclose Ever-Seal's Confidential Information and Materials to DuraSeal to compete against Ever-Seal.

170.    DuraSeal did so for the purpose of injuring Ever-Seal and benefitting DuraSeal at Ever-Seal's expense in willful violation of Ever-Seal's known rights under the Confidentiality Clause.

171.    As a proximate result of DuraSeal's tortious interference with the Lucero Agreement, Lucero materially breached the Confidentiality Clause by using Ever-Seal's Confidential Information and Materials for the benefit of DuraSeal and disseminating, disclosing, or otherwise divulging Ever-Seal's Confidential Information and Materials to DuraSeal for the purpose of competing against Ever-Seal within the two-year period following his October 2021 departure from Ever-Seal.

172.    Such Confidential Information and Materials include but are not limited to Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; and Ever-Seal's confidential and proprietary sales presentation book.

173.    These Confidential Information and Materials are secret, business-related, and afford Ever-Seal a competitive advantage.

174.    As a result of DuraSeal's misconduct, Ever-Seal has and will continue to suffer harm and damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

175.    Additionally, as a result of DuraSeal's misconduct, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and good will.

176. Ever-Seal is entitled to a judgment against DuraSeal awarding Ever-Seal compensatory damages in an amount to be determined at trial and treble damages under Tenn. Code Ann. § 47-50-109.

## COUNT III – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

177. Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its Verified Complaint.

178. Ever-Seal, through its expense and efforts over time, has developed existing and prospective business relationships with an identifiable class of third persons, namely those in the market for permanent concrete and wood sealing services.

179. DuraSeal, by and through its relationship with Halferty, was and is aware of the above business relationships.

180. DuraSeal intended to breach or terminate Ever-Seal's business relationships for DuraSeal's own benefit.

181. DuraSeal has used and is presently using improper means to interfere with Ever-Seal's business relationships, including but not limited to misrepresentations and deceit, misuse of inside or confidential information, breach of contract, breach of a fiduciary relationship, unfair competition, overreaching, and sharp dealing.

182. Ever-Seal had prospective relationships and/or contracts with these third parties.

183. DuraSeal maliciously and intentionally induced Ever-Seal's prospective customers not to enter into contracts with Ever-Seal.

184. In doing so, DuraSeal acted without justification; DuraSeal's interference was not done in the legitimate exercise of its rights, but instead with a design to injure Ever-Seal or gain an advantage at Ever-Seal's expense.

185. But for DuraSeal's interference, these third parties would have maintained and/or formed relationships with Ever-Seal.

186. The prospective customers would have entered into contracts with Ever-Seal but for DuraSeal's interference because Ever-Seal submitted competing bids on the same projects, Ever-Seal performed a nearly identical sales presentation on the same projects, Ever-Seal offered the same sealing solutions utilizing the same product and processes as those ultimately selected on the project (which were different than those offered by other competitors), and Ever-Seal was the only competing bidder authorized to offer a 25-year manufacturer-backed warranty such as the one offered by DuraSeal.

187. Without the benefit of discovery, Ever-Seal is unable to know the full extent and identity of every Ever-Seal customer or prospective customer with whom DuraSeal interfered but, upon information and belief, DuraSeal poached at least 40 such customers/potential customers from Ever-Seal, the identity of whom Ever-Seal has and will provide upon request.

188. DuraSeal continues to actively solicit business and interfere with Ever-Seal's prospective customers.

189. As a result of DuraSeal's interference, Ever-Seal has and will continue to suffer damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

190. In addition, as a result of DuraSeal's interference, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and goodwill.

191. DuraSeal's intentional interference has further forced Ever-Seal to engage in litigation to protect its business interests and enforce its rights under the Agreement; had DuraSeal

not intentionally interfered, then Ever-Seal would not have incurred attorneys' fees and litigation expenses.

192.     Ever-Seal is therefore entitled to a judgment against DuraSeal awarding compensatory and punitive damages in an amount to be determined at trial, and granting a temporary restraining order, temporary injunction, and permanent injunction prohibiting DuraSeal from interfering with Ever-Seal's business relationships, both existing and prospective.

## VI.  PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for the following relief:

(1)     that proper process issue upon Defendant and that it be required to appear and answer to this First Amended Complaint within the time provided by law;

(2)     for temporary, preliminary, and permanent injunctive relief enjoining DuraSeal from employing, contracting, or engaging in any type of working or advisory relationship with Halferty, Lucero, or Goggins (or any other person who worked for or received training at Ever-Seal) for a period of two years from the date DuraSeal's breaches finally cease; from using, disclosing, or disseminating Ever-Seal's Confidential Information and Materials for a period of two years from the date DuraSeal's breaches finally cease; and from interfering with Ever-Seal's prospective business relationships;

(3)     for judgment against Defendant in an amount to be proved at trial, but not less than $75,000, plus compensatory, punitive, and treble damages, and such other further damages to which Plaintiff may be entitled; and

(4)     for attorney fees, litigation expenses, and other costs associated with bringing these claims;

(5)     for such further and other relief.

(6)     Nothing in this Amended Complaint shall be construed as an attempt to collect a debt from Stephen Halferty or authorizing acts prohibited by 11 U.S.C. § 362.  The relief requested herein is solely limited to DuraSeal Inc.

## **JURY DEMAND**

Plaintiff demands a jury trial on all claims and issues so triable.


Respectfully submitted,


/s/ Stephen J. Zralek
Stephen J. Zralek, BPR #18971
SPENCER FANE BONE MCALLESTER
511 Union Street, Suite 1000
Nashville, TN 37219
Tel: (615) 238-6305
Fax: (615) 687-2763
szralek@spencerfane.com

Breanna R. Spackler (admitted *pro hac vice*)
SPENCER FANE LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Tel: (816) 292-8487
Fax: (816) 474-3216
bspackler@spencerfane.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I declare under penalty of perjury that the foregoing allegations in the Verified Complaint are true and correct, except those made upon information and belief and, as to those, I reasonably believe them to be true.

Executed this 17th day of June, 2022.

_____

Steve Nelson, Chief Executive Officer and Treasurer
Ever-Seal, Inc.

NSH 2485024.6

## CERTIFICATE OF SERVICE

I certify that on June 17, 2022, I served a copy of this document via ECF on Defendant's counsel of record:

Thomas W. Shumate IV, Esq.
Meridian Law PLLC
5141 Virginia Way, Suite 320
Brentwood, TN 37027
tom.shumate@meridian.law
*Counsel for Defendant*

/s/ Stephen J. Zralek

NSH 2485024.6

# citrix | RightSignature



**REFERENCE NUMBER**
85275905-6507-4B3E-AED3-9A1B6052B43E

## SIGNATURE CERTIFICATE

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>85275905-6507-4B3E-AED3-9A1B6052B43E | **Document Name**<br>First Amended Complaint Against Duraseal |
| **Transaction Type**<br>Signature Request | **Filename**<br>first_amended_complaint_against_duraseal.pdf |
| **Sent At**<br>06/17/2022 10:51 EDT | **Pages**<br>32 pages |
| **Executed At**<br>06/17/2022 11:07 EDT | **Content Type**<br>application/pdf |
| **Identity Method**<br>email | **File Size**<br>533 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>4aeb748b07b782ed0f3e6a615975a91296fc14b7fb5a24b8f0ba56cf02a5cd54 |
| **Signed Checksum**<br>1ac969ecc01efa3ff4e2a3a6b95d37cd6259ee29fc1dc08d2000d26bf6354c5d | |
| **Signer Sequencing**<br>Disabled | |
| **Document Passcode**<br>Enabled | |

# SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Steven Nelson | **Status**<br>signed | **Viewed At**<br>06/17/2022 11:06 EDT |
| **Email**<br>steve@ever-seal.com | **Multi-factor Digital Fingerprint Checksum**<br>f1d8beef5a4d0d240f48171932fa97a549816fd780ddc39b801700d43f42ed39 | **Identity Authenticated At**<br>06/17/2022 11:07 EDT |
| **Components**<br>1 | **IP Address**<br>76.18.137.53 | **Signed At**<br>06/17/2022 11:07 EDT |
| | **Device**<br>Samsung Browser via Android | |
| | **Drawn Signature** | |
| | **Signature Reference ID**<br>1223A204 | |
| | **Signature Biometric Count**<br>350 | |

# AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 06/17/2022 10:51 EDT | Melissa Tomasewski (mtomasewski@spencerfane.com) created document 'first_amended_complaint_against_duraseal.pdf' on Chrome via Windows from 172.126.53.160. |
| 06/17/2022 10:51 EDT | Steven Nelson (steve@ever-seal.com) was emailed a link to sign. |
| 06/17/2022 11:04 EDT | Steven Nelson (steve@ever-seal.com) viewed the document on Samsung Browser via Android from 76.18.137.53. |
| 06/17/2022 11:06 EDT | Steven Nelson (steve@ever-seal.com) viewed the document on Samsung Browser via Android from 76.18.137.53. |
| 06/17/2022 11:07 EDT | Steven Nelson (steve@ever-seal.com) authenticated via email on Samsung Browser via Android from 76.18.137.53. |

06/17/2022 11:07 EDT        Steven Nelson (steve@ever-seal.com) signed the document on Samsung Browser via Android from 76.18.137.53.