# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **STEPHEN BRADLEY HALFERTY,** | ) | **Case No. 22-00101-05-DMW** |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| | ) | |
| **EVER-SEAL, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adv. Proc. No. _____** |
| v. | ) | |
| | ) | |
| **STEPHEN BRADLEY HALFERTY** | ) | |
| **d/b/a DURASEAL,** | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff Ever-Seal, Inc. ("Plaintiff" or "Ever-Seal") by and through undersigned counsel, for its Verified Complaint against Defendant Stephen Bradley Halferty d/b/a DuraSeal ("Defendant" or "Halferty"), states and alleges as follows:

### I. INTRODUCTION

1.     Ever-Seal recently learned that its former sales manager, Stephen Bradley Halferty, is competing with Ever-Seal and using Ever-Seal's confidential and inside information to do so despite the parties' valid and enforceable Confidentiality Agreement, which includes both a non-competition clause and a confidentiality clause prohibiting such conduct.

2.     Upon further investigation, it appears that Halferty's ongoing competition is just the tip of the iceberg.

131935991.1

3.      In fact, Halferty has been competing directly with Ever-Seal since months prior to his termination and in the most egregious manner – surreptitiously stealing prospective clients and usurping business opportunities for his own personal benefit through various forms of lies, deceit, self-promotion, and underhanded tactics, and utilizing Ever-Seal's confidential and inside information, as well as employees, in order to do so.

4.      As a result of Halferty's self-serving and callous behavior, Ever-Seal has already lost business, profits, opportunities, customer relationships, and good will, and such harm is ongoing and likely to increase as Ever-Seal's busiest season is quickly approaching this Spring.

5.      Specifically, Ever-Seal's sales typically jump from approximately $100,000 per month in December, January, and February to over $1,000,000 per month in March, April, and May, when people begin spending more time outdoors on their decks and patios.

6.      Ever-Seal brings the present action to halt the immediate, ongoing, and irreparable harm caused by Halferty's misconduct, to attempt to recover the post-petition losses caused by it, and to deter Halferty from engaging in such conduct in the future.

7.      On or about January 14, 2022, Halferty filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.

8.      This action references the unlawful conduct of Halferty that occurred both before and after he filed his bankruptcy petition.  However, Ever-Seal acknowledges that 11 U.S.C. § 362(a) stays the commencement of an action against Halferty to recover a claim against him that arose before the commencement of this bankruptcy case.  To resolve any doubt, this action is not an attempt to collect damages relating to pre-petition conduct of Halferty.

131935991.1

## II.  PARTIES

9.      Plaintiff Ever-Seal is a Tennessee corporation with its principal place of business located at 242 W. Main St., Suite 311, Hendersonville, TN 37075.

10.     Ever-Seal provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States, including service areas in Alabama, Georgia, Indiana, North Carolina, South Carolina, Kentucky, Tennessee, and Virginia.

11.     Halferty is a citizen and resident of the state of North Carolina who may be served at 1132 Shadow Lake Dr., Raleigh, NC 27615 and does business under the name DuraSeal.

12.     Halferty worked for Ever-Seal from approximately May 2020 to November 2021.

## III.  JURISDICTION AND VENUE

13.     Congress granted original jurisdiction to the district courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11," 28 U.S.C. § 1334(b), and authorized automatic referral of proceedings covered by 28 U.S.C. § 1334(b) to the bankruptcy courts.  *See* 28 U.S.C. § 157(a).  This district has provided for such a referral.

14.     This proceeding is related to a case under title 11, solely by virtue of the Debtor having filed a Chapter 13 case. This matter is a non-core proceeding.  Plaintiff does not consent to entry of final orders or judgment by the Bankruptcy Court.

15.     Plaintiff demands a jury trial of the claims it asserts and does not consent to a trial before the Bankruptcy Court. *See* 28 U.S.C. § 157(e).

16.     Venue in this court is proper pursuant to 28 U.S.C. § 1409(a).

131935991.1

## IV.  FACTUAL ALLEGATIONS

**Ever-Seal Background**

17.     Ever-Seal is Tennessee corporation formed in 2018 that provides wood and concrete restoration and permanent sealing services.

18.     Ever-Seal utilizes a one-time sealant solution called "Seal-It" that is backed by a 25-year manufacturer's warranty.

19.     Ever-Seal is one of only five companies in the United States authorized to offer and install manufacturer-warranted Seal-It.

20.     Seal-It is a penetrant that requires specialized processes in order to accurately and permanently seal exterior wood or concrete.

21.     Since its inception, Ever-Seal has developed certain confidential and proprietary processes, applications, and materials beyond those dictated by the manufacturer in order to set Ever-Seal apart from its competition.

**Ever-Seal Engages Halferty**

22.     On or about May 26, 2020, Ever-Seal engaged Halferty as an estimator for its sales territory in and around Raleigh, North Carolina.

23.     In his role as estimator, Halferty was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.

24.     At the end of the sales appointments, Halferty would provide his Ever-Seal business card to prospective clients for future correspondence.

131935991.1

25.    Halferty had no prior experience in the concrete and wood sealing industry when he was hired by Ever-Seal.

26.    Ever-Seal trained Halferty on Ever-Seal's unique products, processes, and methods for applying its permanent sealing solution.

27.    Ever-Seal further trained Halferty on how to do Ever-Seal's sales presentation, use Ever-Seal's sample and testing materials, measure to accurately bid projects, complete Ever-Seal paperwork, answer prospective customer questions, and perform other general functions involved in the day-to-day tasks of an Ever-Seal sales representative.

28.    Although Halferty's primary sales territory was based in a 100-mile radius from Raleigh, North Carolina, Halferty worked wherever Ever-Seal scheduled him, including in Virginia, Kentucky, Indiana, Georgia, and South Carolina.

29.    In late 2020, Ever-Seal promoted Halferty to sales manager for Ever-Seal.

30.    In his role as sales manager, Halferty was responsible for assisting sales representatives in each Ever-Seal market area at the direction of Ever-Seal management and per Ever-Seal standards, in addition to overseeing his assigned territory in Raleigh, North Carolina and continuing to run the sales appointments assigned to him by Ever-Seal.

31.    Halferty's duties as sales manager included, among others, reviewing each sale as it came in to ensure accuracy before forwarding it to the operations manager, training each new estimator in the new hire's territory, working with each sales team member quarterly for at least one full day in the team members' territory to provide additional training and support, and responding to customer complaints and resolution plans pertaining to estimates.

131935991.1

32.     In his role as sales manager, Halferty had broad access to Ever-Seal's systems and data, including but not limited to Ever-Seal's G-Suite application by and through which Halferty could see historical and future appointment information for the entire sales and operations teams.

33.     In his role as sales manager, Halferty learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price.

34.     In both roles, Halferty had the authority to act on behalf of Ever-Seal for the benefit of Ever-Seal, but Ever-Seal controlled the methods and manner by which Halferty accomplished his work.

35.     In both roles, Halferty was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new customer relationships and business for Ever-Seal.

36.     At the commencement of his working relationship with Ever-Seal, Halferty executed a Confidentiality Agreement, a true and correct copy of which is attached hereto as **Exhibit A**.

37.     The Confidentiality Agreement includes a non-competition clause that prohibits Halferty from competing against Ever-Seal for a period of two years following his termination from Ever-Seal.  Ex. A, at ¶ 3.

38.     The Confidentiality Agreement further includes a confidentiality clause that prevents Halferty's unauthorized use, disclosure, and dissemination of Ever-Seal's Confidential Information and Materials, both during his working relationship with Ever-Seal and for a period of two years thereafter.  *Id.* at ¶¶ 3-5.

39.     The Confidentiality Agreement defines Confidential Information as:

131935991.1

Confidential Information means information disclosed by [Ever-Seal] to [Halferty], or its agents, employees and/or independent contractors, in any manner, that is not generally known in the industry in which [Ever-Seal] is engaged, about its business and which [Ever-Seal] desires to be kept confidential.  As to Ever-Seal, Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative, management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

*Id.* at ¶ 1.

40.     The Confidentiality Agreement defines Confidential Materials as:

Confidential Materials includes all physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

*Id.* at ¶ 2.

41.     Halferty expressly acknowledged that he "is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with [his work for Ever-Seal] and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature."  *Id.* at ¶ 3.

42.     Halferty further acknowledged that "compliance with the terms of this [Confidentiality Agreement] is necessary to protect the business and good will of each party" and "a breach of this [Confidentiality Agreement] will irreparably and continually damage the other and that an award of monetary damages will not be adequate to remedy such harm" such that Ever-Seal "shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of money damages, insofar as they can be determined, including, without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement."  *Id.* at ¶ 8.

131935991.1

43.    During the course of his working relationship with Ever-Seal, Ever-Seal provided Halferty access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality.

44.    In November 2021, Ever-Seal terminated its relationship with Halferty for failing to show up to scheduled appointments with customers.

45.    On or about November 25, 2021, Ever-Seal requested in writing that Halferty return all Confidential Materials provided to him by Ever-Seal (i.e. the physical embodiments of Ever-Seal's Confidential Information).

46.    Halferty failed and refused to return Ever-Seal's Confidential Materials, including but not limited to Ever-Seal's custom sales cases, presentation materials, sample materials, testing materials, marketing materials, and confidential forms and spreadsheets.

**Ever-Seal Learns of Halferty's Misconduct**

47.    Ever-Seal learned in late December 2021 and early January 2022 that Halferty has been competing directly against Ever-Seal for business.

48.    As it turns out, Halferty has been surreptitiously competing with Ever-Seal for business since approximately June 2021.

131935991.1

49.     Upon information and belief, Halferty started a company called DuraSeal, or otherwise began doing business under the name DuraSeal, around June 2021.

50.     DuraSeal, like Ever-Seal, provides permanent sealing services for wood and concrete backed by a 25-year warranty.

51.     DuraSeal, like Ever-Seal, utilizes Seal-It for its sealing solution.

52.     DuraSeal, like Ever-Seal, provides services in at least North Carolina and South Carolina.

53.     Halferty utilized both his relationship with Ever-Seal and the Confidential Information and Materials he learned from Ever-Seal to divert business from Ever-Seal to DuraSeal, and began doing so while he was still employed by Ever-Seal.

54.     For one example, in or around June 2021, Ever-Seal provided an estimate on a $75,000 job in Banner Elk, North Carolina; although Ever-Seal fielded the inquiry, set up the meeting, and provided the requisite information and estimate to the prospective client, Halferty utilized his role as sales manager to usurp the opportunity for his own personal benefit by way of fraud and deception and signed the customer up for a contract with DuraSeal rather than Ever-Seal.

55.     For another example, in or around December 2021, Ever-Seal received a call from a woman inquiring why the work on her home had not yet started when she paid her deposit of $10,000 in October 2021; when Ever-Seal informed the woman that it did not find her project in its system, the woman inquired "doesn't Brad Halferty work for Ever-Seal?" As it turns out, Halferty utilized his relationship with Ever-Seal and the information he learned from Ever-Seal to underhandedly take the opportunity for his own personal benefit by and through DuraSeal.

56.     But for Halferty's interference, these jobs would have gone to Ever-Seal.

131935991.1

57.     Ever-Seal does not know the full extent of Halferty's conduct and actions taken to compete with Ever-Seal, but Halferty has engaged in at least the following actions, all without Ever-Seal's knowledge or authority, while still working for Ever-Seal:

a.     Halferty utilized his role at Ever-Seal to acquire directly from the manufacturer DuraSeal's supply of Seal-It;

b.     Halferty utilized his role with Ever-Seal to poach leads for DuraSeal;

c.     Halferty utilized his role with Ever-Seal to poach operations and sales staff for DuraSeal;

d.     Halferty utilized his role with Ever-Seal to secure jobs for DuraSeal;

e.     Halferty attended Ever-Seal appointments with prospective customers and unbeknownst to the customer or Ever-Seal directed the work to DuraSeal; he directed the easier jobs to DuraSeal and the more complex, difficult, or undesirable jobs to Ever-Seal;

f.     Halferty attended Ever-Seal appointments with prospective customers and purposely did not make the sale on behalf of Ever-Seal but, instead, utilized the meeting to sabotage Ever-Seal's chances and/or otherwise learn information to secure the sale for DuraSeal (such as by bidding the project high, refusing to do the proper or full sales presentation, being unfriendly, etc.);

g.     Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal would complete the project sooner or for a fraction of the price bid by Ever-Seal;

h.     Halferty encouraged or induced prospective customers of Ever-Seal to utilize DuraSeal's services by representing that DuraSeal, unlike Ever-Seal, was a local company;

     i.     Halferty guided customers into contracts with DuraSeal, only after securing the meeting with them through his work at Ever-Seal or otherwise becoming aware of them through his work with Ever-Seal, and those customers would have entered into contracts with Ever-Seal but for his interference and misconduct;

     j.     Halferty personally attended DuraSeal sales appointments and attempted to sell on behalf of DuraSeal the same services offered by Ever-Seal in the same region;

     k.     Halferty utilized information from Ever-Seal files and databases to secure the project for DuraSeal where Ever-Seal and DuraSeal submitted competing bids on the same project;

     l.     Halferty, in his role as sales manager, encouraged or assisted Ever-Seal sales representatives to sabotage Ever-Seal sales presentations for the benefit of DuraSeal, such as by purposely bidding the project high, and would offer monetary incentives to do so;

     m.     Halferty encouraged or assisted other Ever-Seal sales representatives to cover his Ever-Seal sales appointments so that he could sell the same project on DuraSeal;

     n.     Halferty failed to attend his assigned Ever-Seal sales appointments for the benefit of DuraSeal.

58.     To date, DuraSeal continues to compete directly against Ever-Seal by submitting bids on the same projects.

59.     To date, DuraSeal continues to compete directly against Ever-Seal by marketing in the same territories.

60.     To date, DuraSeal continues to compete directly against Ever-Seal by offering the same permanent sealing services as Ever-Seal utilizing the same product, processes, and representations.

131935991.1

61.    Halferty further utilized and continues to utilize Ever-Seal's Confidential Information and Materials to compete unfairly with Ever-Seal.

62.    Ever-Seal does not know the full extent of Halferty's unauthorized use, dissemination, and/or disclosure of Ever-Seal's Confidential Information and Materials but Halferty has at least engaged in the following actions both while employed by Ever-Seal and subsequent to his termination:

a.    Used and/or continues to use Ever-Seal's unique techniques, products, and processes for sealing wood and concrete to do business for DuraSeal;

b.    Used and/or continues to use Ever-Seal's private information on leads, inquiries, and prospective customer relationships to acquire business for DuraSeal;

c.    Used and/or continues to use Ever-seal's private bid information to acquire business for DuraSeal;

d.    Used and/or continues to use Ever-Seal's sales presentation, or portions thereof, in his presentations to prospective customers on behalf of DuraSeal;

e.    Used and/or continues to use Ever-Seal's photographs from Ever-Seal jobs in his marketing materials on behalf of DuraSeal;

f.    Used or/or continues to use marketing research paid for by Ever-Seal, for Ever-Seal, to obtain new business for DuraSeal;

g.    Used and/or continues to use recruiting drives paid for by Ever-Seal, for Ever-Seal, to staff the DuraSeal brand;

h.    Used and/or continues to use Ever-Seal's proprietary truck design and functionality in his business with DuraSeal.

131935991.1

63.     Halferty engaged in the foregoing conduct intentionally, fraudulently, maliciously, and recklessly.

64.     Halferty's unlawful competition against Ever-Seal and improper use of Ever-Seal's Confidential Information and Materials occurred both before and after Halferty commenced the above-captioned bankruptcy case on January 14, 2022.

**Ever-Seal Has Been Damaged**

65.     Halferty utilized and continues to utilize his former role at Ever-Seal for his own personal gain and to compete unfairly with Ever-Seal, driving customers away from Ever-Seal and to his own business, DuraSeal.

66.     Halferty utilized and continues to utilize Ever-Seal's Confidential Information and Materials for his own personal gain and to compete unfairly with Ever-Seal.

67.     Ever-Seal has been damaged as a result of Halferty's post-petition conduct described herein.

68.     Ever-Seal lost business and profits as a result of Halferty's post-petition conduct.

69.     Ever-Seal is aware of at least 12 separate jobs that Halferty sourced directly from Ever-Seal and that would have gone to Ever-Seal but for Halferty's interference.

70.     Ever-Seal experienced a significant reduction in its ratio of leads to estimates as a result of Halferty's conduct.

71.     Ever-Seal failed to satisfy test marketing sales expectations in at least North Carolina as a result of Halferty's conduct.

72.     Ever-Seal lost and continues to lose prospective customer relationships, goodwill, and fair competition as a result of Halferty's conduct.

## V.  CLAIMS

## COUNT I – BREACH OF CONTRACT

73.    Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its Verified Complaint.

74.    On May 26, 2020, Halferty entered into a Confidentiality Agreement with Ever-Seal, a true and correct copy of which is attached as Exhibit A.

75.    The Confidentiality Agreement is an enforceable contract between Ever-Seal and Halferty.

76.    The Confidentiality Agreement states in part:

[E]mployees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

Ex. A, at ¶ 3.  Plaintiff hereinafter refers to this provision as the "**Non-Compete Clause**."

77.    Halferty materially breached (and continues to materially breach) the Non-Compete Clause because, during his working relationship with Ever-Seal and within the two-year period following his termination from Ever-Seal, Halferty entered into employment, contract, or otherwise advised DuraSeal, which competes directly or indirectly with Ever-Seal.

78.    Halferty, through DuraSeal, is presently competing with Ever-Seal in at least North Carolina and South Carolina.

79.    The Confidentiality Agreement further provides that Halferty "shall use any Confidential Information and Materials received [from Ever-Seal] solely in connection with [his work for Ever-Seal]" and that, during his working relationship with Ever-Seal and for two years after, he "will never, directly or indirectly, use, disseminate, disclose or other wise divulge any

131935991.1

Confidential Information or Confidential Material" and "shall prevent any unauthorized disclosure of Confidential Information or Materials by [his] employees, agents or independent contractors." Ex. A, at ¶¶ 3, 5.   Plaintiff refers to these provisions as the "**Confidentiality Clause**."

80.   Halferty materially breached (and continues to materially breach) the Confidentiality Clause because, during his working relationship with Ever-Seal and within the two-year period following his termination from Ever-Seal, Halferty used, disseminated, and/or disclosed Ever-Seal's Confidential Information and Materials beyond the scope of his work for Ever-Seal for the purpose of competing with Ever-Seal.

81.   Such Confidential Information and Materials include but are not limited to Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality.

82.   Such Confidential Information and Materials are secret, business-related, and afford Ever-Seal a competitive advantage.

83.   The Confidentiality Agreement further states "[e]ach party will return to the other all Confidential Material and copies thereof at any time upon request and, in any event and without

such a request, upon termination of the investigation and evaluation which is the subject of this Agreement." Ex. A, at ¶ 7. Plaintiff refers to this provision as the "**Return Clause**."

84.    Halferty materially breached (and continues to materially breach) the Return Clause because he failed and refused to return Ever-Seal's Confidential Materials upon request and following his termination from Ever-Seal.

85.    Such Confidential Materials include but are not limited to Ever-Seal's custom sales cases, presentation materials, sample materials, testing materials, marketing materials, and confidential forms and spreadsheets.

86.    Upon information and belief, Halferty is using these Confidential Materials in his competing business with Ever-Seal.

87.    As a result of these breaches, Ever-Seal has and will continue to suffer harm and damages in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

88.    Additionally, as a result of these post-petition breaches, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships, fair competition, and good will.

89.    Ever-Seal is therefore entitled to a judgment against Halferty awarding Ever-Seal compensatory damages in an amount to be determined at trial; granting a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Halferty from competing against Ever-Seal and from using or disclosing Ever-Seal's Confidential Information and Materials for a period of two years from the date the ongoing breaches stop occurring; and awarding Ever-Seal reasonable attorney fees and expenses (*see* Ex. A, at ¶ 8).

131935991.1

## COUNT II – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

90.    Plaintiff hereby reasserts those allegations set forth in the preceding paragraphs of its Verified Complaint.

91.    Ever-Seal, through its expense and efforts over time, has development a prospective business relationship with an identifiable class of third persons, namely those in the market for permanent concrete and wood sealing services.

92.    Halferty is aware of this prospective business relationship.

93.    Halferty intended and intends to cause a breach or termination to Ever-Seal's prospective business relationship for his own personal benefit.

94.    Halferty has used and is presently using improper and unlawful means to interfere with Ever-Seal's prospective business relationship, including but not limited to misrepresentations and deceit, misuse of inside or confidential information, breach of contract, and breach of a fiduciary relationship.

95.    Ever-Seal had a prospective contract with these potential customers.

96.    Halferty maliciously and intentionally induced Ever-Seal's prospective customers not to enter into contracts with Ever-Seal.

97.    In doing so, Halferty acted without justification.

98.    Halferty's interference was not done in the legitimate exercise of his rights, but with a design to injure Ever-Seal or gain some advantage at Ever-Seal's expense.

99.    But for Halferty's interference, these prospective customers would have entered into contracts with Ever-Seal.

100.    Specifically, the prospective customers would have entered into contracts with Ever-Seal but for Halferty's interference because Ever-Seal submitted competing bids on the same

131935991.1

projects, Ever-Seal performed a nearly identical sales presentation on the same projects, Ever-Seal offered the same sealing solutions utilizing the same product and processes as those ultimately selected on the project (which were different than those offered by other competitors), and Ever-Seal was the only competing bidder authorized to offer a 25-year manufacturer backed warranty such as the one offered by DuraSeal.

101.    Ever-Seal is unable without the benefit of discovery to know the full extent and identity of each Ever-Seal prospective customer with whom Halferty interfered but, upon information and belief, such prospective customers include at least: Mary Cunningham, Sarah Bartlett, William Hatcher, Denise Barefoot, Lenna Gray, David Turner, Donna Young, Brian Emmett, Libby Mitchiner, Todd Lautzenheisor, Darlene Winston, and Harry Comer.

102.    Halferty continues to actively solicit business under the name DuraSeal, and continues to interfere with Ever-Seal's prospective customers.

103.    As a result of Halferty's interference, Ever-Seal has and will continue to suffer damages for post-petition conduct in an amount to be determined at trial, including without limitation lost profits and administrative, marketing, recruiting, and training costs.

104.    As a result of Halferty's interference, Ever-Seal has and will continue to suffer immediate, substantial, continuing, and irreparable injury, including without limitation loss of customer relationships and good will.

105.    Ever-Seal is therefore entitled to a judgment against Halferty awarding compensatory and punitive damages in an amount to be determined at trial, and granting a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Halferty from interfering with Ever-Seal's business relationships, actual or prospective.

131935991.1

## VI.  PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for the following relief:

(1)    that proper process issue upon Defendant and that he be required to appear and answer to this Verified Complaint within the time provided by law;

(2)    for entry of temporary, preliminary, and permanent injunctive relief prohibiting Defendant, and all those acting in concert with him, from engaging in conduct that competes with Ever-Seal, from using or disclosing Ever-Seal's Confidential Information and Materials, and from interfering with Ever-Seal's prospective business relationships;

(3)    for judgment against Defendant for post-petition damages in an amount to be proved at trial, plus costs and attorney fees incurred, and such other further damages to which Plaintiff may be entitled; and

(4)    for such further and other relief as may be appropriate in accordance with the nature of this cause.

## VII.  JURY DEMAND

Plaintiff demands a jury trial on all claims and issues so triable.

This the 17th day of March, 2022.

Respectfully submitted,

FOX ROTHSCHILD LLP

By: /s/ Brian R. Anderson
    Brian R. Anderson
    N.C. State Bar No. 37989
    230 N. Elm St., Suite 1200
    Greensboro, NC 27401
    branderson@foxrothschild.com
    (336) 378-5205

    -and-

131935991.1

SPENCER FANE LLP

By: ___/s/ *Stephen J. Zralek*_____
   Stephen J. Zralek
   T.N. Bar No. 18971
   511 Union Street, Suite 1000
   Nashville, TN 37219
   Tele: (615) 238-6305
   Fax: (615) 687-2763
   szralek@spencerfane.com
  (Notice of Special Appearance forthcoming)

   Breanna R. Spackler
   M.O. Bar No. 67323
   1000 Walnut, Suite 1400
   Kansas City, MO 64106
   Tele: (816) 292-8487
   Fax: (816) 474-3216
   bspackler@spencerfane.com
  (Notice of Special Appearance forthcoming)

*Attorneys for Plaintiff*

131935991.1

## **VERIFICATION**

I declare under penalty of perjury that the foregoing allegations in the Verified Complaint are true and correct, except those made upon information and belief and, as to those, I reasonably believe them to be true.

Executed this _16_ day of March, 2022.

_____

Steve Nelson, Chief Executive Officer and Treasurer
Ever-Seal, Inc.

NSH 2418224.2



**Exhibit A**

## CONFIDENTIALITY AGREEMENT

This Agreement, dated the 26 day of May, 2020, between Ever-Seal Incorporated and its subsidiaries, whose address is 242 West Main Street, Suite 311 Hendersonville, Tennessee 37075 ("Ever-Seal Inc.") and Brad Halferty,("employee"), sets forth the terms and conditions for the confidential disclosure of information between them in connection with a proposed business opportunity contemplated by them (hereafter the "Transaction"). As used herein, the party disclosing information is referred to as "Discloser" and the party to whom such information is disclosed is referred to as "Recipient." These terms and conditions shall be effective regardless of whether or not the Transaction is entered into. If the Transaction is entered then the terms of this Agreement shall remain in full force and effect throughout the term of such Transaction and thereafter, as provided herein. Therefore, the parties agree as follows:

1. **Confidential Information.** Confidential Information means information disclosed by Discloser to Recipient, or its agents, employees and /or independent contractors, in any manner, that is not generally known in the industry in which Discloser is engaged, about its business and which Discloser desires be kept confidential. As to Ever-Seal Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative, management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

2. **Confidential Material.** Confidential Materials includes all physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

3. **Restrictions on Disclosure and Dissemination.** Each party acknowledges it is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with the Transaction and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature. Each party further acknowledges that, except as otherwise provided herein, during the term of the Transaction and for a period of two years thereafter, it will never, directly or indirectly, use, disseminate, disclose or other wise divulge any Confidential Information or Confidential Material. Further, each party shall prevent any unauthorized disclosure of Confidential Information or Materials by its employees, agents or independent contractors. Furthermore, employees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

4. **Exceptions to Restrictions on Disclosure.** Confidential Information shall not include any information that (i) is or becomes generally known in the trade or industry in which Discloser is engaged and is available to the public other than as a result of a disclosure by Recipient or its employees, agents or independent contractors in breach of this Agreement; (ii) can be demonstrated to have been in Recipient's possession prior to disclosure by Discloser; (iii) has come into the possession of Recipient from a third party who is not known by Recipient to be under any obligation to Discloser to maintain the confidentiality of such information; (iv) was independently developed by Recipient without the use of any Confidential Information; or (v) where disclosure of such Confidential Information has been consented to by Discloser in writing. Each party agrees that the other party shall have no obligation to grant such consent to disclose, and that any refusal by either party shall be in its sole discretion, without explanation to the other party or recourse by it.

5. **Use of Confidential Information and Materials.** Recipient shall use any Confidential Information and Materials received solely in connection with the Transaction. Recipient shall treat and handle all Confidential Information with the same standard of care used with respect to its own confidential information. Recipient agrees to disclose such Confidential Information only to (i) its officers, directors, employees and affiliates involved in the Transaction; (ii) to such agents, representatives, attorneys and advisors as have been retained by Recipient in connection with the Transaction; (iii) in response to subpoena, court order or similar legal process, or as otherwise required by applicable law or regulation.

Recipient shall not remove any proprietary rights legends from Confidential Materials and shall add proprietary rights legends to any materials that disclose or embody Confidential Information. Other than as expressly granted in writing, Discloser does not grant any license to Recipient under any copyrights, patents, trademarks, trade secrets or other proprietary rights to use or reproduce any Confidential Materials. Neither party shall remove from the offices of the other, without written consent, books, records or documents, nor make copies of such books, records, documents or client lists for a use other than in connection with the Transaction.

6.  **Obligations Recipient in Event of Subpoena or Legal Process.** If Recipient is required by subpoena, court order or similar legal process, applicable law or regulation to disclose Confidential Information, Recipient will use its reasonable best efforts to provide Discloser advance notice so as to afford it the opportunity, at Discloser's sole cost and expense, to pursue a protective order or other remedy and Recipient shall reasonably cooperate with Discloser in such efforts so long as such cooperation does not expose Recipient to risk of liability, penalty or censure. In no event shall Recipient be liable for any damages resulting from disclosure of the Confidential Information pursuant to this paragraph 6.

7.  **Return of Confidential Material.** Each party will return to the other all Confidential Material and copies thereof at any time upon request and, in any event and without such a request, upon termination of the investigation and evaluation which is the subject of this Agreement. At Discloser's option, such Confidential Materials may be destroyed by Recipient who shall then provide Discloser with an affidavit attesting to such destruction.

8.  **Breach of Agreement and Remedies.** The parties agree that compliance with the terms of this Agreement is necessary to protect the business and good will of each party. Further, the parties agree that a breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm. Therefore, the parties agree that each shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of money damages, insofar as they can be determined, including, without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement.

9.  **Applicable Law.** This Agreement and the validity, interpretation, performance and enforcement hereof shall be governed by the domestic laws of the State of Tennessee without giving effect to the principles of conflicts of laws thereof. The parties further agree that any legal action or proceeding relating to any dispute arising hereunder between the parties shall be brought in the courts of the State of Tennessee, USA. The parties also agree that service of process may be served by certified mail, return receipt requested.

10. **Waiver of Breach.** The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

11. **Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

12. **Notices.** Any notice required or permitted to be given pursuant to this Agreement shall be sufficiently given when delivered or, if sent by Certified Mail, postage prepaid, return receipt requested, on the third day after such mailing, directed to an officer of Ever-Seal Inc.. at the address set forth at the beginning of this Agreement, or to such other address as a party shall designate in writing to the other.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under their seals as of the date and year first written above.

Ever-Seal Inc. & Subsidiaries.

By: _____                       By: _____
        Steve M Nelson                                                    signature

Name: Steve Nelson                                          Name: Brad Halferty

Title:   CEO                                                          Title: Estimator

Ever-Seal Inc. .NCND V.1                               2